**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-_____ (JKS) |
| Avilac Inc., Eagle Communication Trade Co. Ltd., Games to Go, LLC, HongKong Bishop Technoogy Co. Lim., Ignite International Ltd., InTech Electronic Co. Limited, M&M Global Enterprises LLC, Ritech Smart Technology Limited, Yellow Spot Communications Limited, and Yue Xin Electric Technology Limited, | |
| Defendants. | |

**COMPLAINT**

Plaintiff PCT Litigation Trust ("PCT" or "Plaintiff"),[2] established in the above-captioned

chapter 11 cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint

(the "Complaint") against each of the above-named Defendants, individually (each a "Defendant"

and referred to individually as such herein), pursuant to sections 547 and 550 of title 11 of the

---

[1]    The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]    The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"), seeking to avoid and recover all preferential transfers of property made by the Debtors to or for the benefit of Defendant plus interest, attorneys' fees, and costs.  To the extent that a Defendant has filed a proof of claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtors or the Debtors' estates (collectively, the "<u>Claims</u>"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any of such Claims for any reason including, but not limited to, 11 U.S.C. § 502(a) through (j), and such rights are expressly reserved.  Notwithstanding this reservation of rights, certain relief pursuant to section 502 of the Bankruptcy Code is sought by PCT herein as further stated in Count III below.  PCT alleges as follows:

## **INTRODUCTION**

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat.  The Nevada Financial Institutions Division ("<u>Nevada FID</u>") shut down Prime on June 21, 2023, and Prime filed for bankruptcy shortly thereafter on August 14, 2023.  Most of Prime's customers suffered losses and have yet to receive any of the fiat or crypto owed to them.  But, between May 16, 2023 and the Petition Date,[3] Prime transferred to Defendant, by or on behalf of Pagotec Consultancy LTD (the "<u>Integrator</u>"), the fiat and/or crypto as alleged below (the "<u>Transfers</u>").[4]

---

[3]   Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "<u>Petition Date</u>"), meaning Prime's non-insider preference period (the "<u>Preference Period</u>") was between May 16, 2023 and the Petition Date.

[4]   The Transfer amounts alleged and sought herein are net of any potential subsequent new value that Defendant transferred to Prime during the Preference Period, as determined by PCT and its retained expert.  Defendant bears the burden of providing any affirmative defenses to this action, including the subsequent new value defense.

2.      Prime served two types of customers: integrators and end-users.

3.      Integrators, including the Integrator alleged here, were typically sophisticated crypto companies that contracted with Prime through various service-related agreements ("Integrator Agreements").  Integrators directly accessed services provided on Prime's platform through an Application Programming Interface ("API") provided to the Integrator.

4.      Integrators had their own customers (*i.e.*, the "End-Users") that did not directly procure Prime's services.  Rather, after satisfying "Know Your Customer" requirements with an Integrator, End-Users accepted or agreed to a user agreement with Prime (the "End-User Agreement"), making the customer an "End-User" of Prime.  End-User Agreements were presented to End-Users by an Integrator through the Integrator's system, which connected to Prime's platform through the API technology and services supplied to the Integrator by Prime.

5.      Each of the Transfers that PCT seeks to avoid by this action was transferred by Prime to or for the benefit of Defendant either: (i) as an End-User of Prime, or, (ii) if Defendant was not an End-User, by and on behalf of Integrator or Integrator's customer which was an End-User of Prime.[5]

6.      On July 18, 2025, the Court entered its *Order Granting Plan Administrator's Motion for Entry of an Order: (I) Approving the Plan Administrator's Determination that the Debtors' Assets are Property of the Bankruptcy Estates; (II) Approving Distributions of Estate Property; (III) Establishing Procedures for Setting a Disputed Claims Reserve; and (IV) Granting*

---

[5]   It is PCT's position the Transfers alleged herein that Prime made during the Preference Period were to or for the benefit of Integrator and, as such, are recoverable from Integrator.  PCT intends to rely on the claims asserted herein **_only_** to the extent that the Court may find that Integrator is not the proper party from which PCT should seek to avoid and recover the Transfers.  To that end, PCT intends to move to stay this adversary proceeding (this "Adversary Proceeding") against Defendant pending resolution of PCT's claims against Integrator.

*Related Relief* [Docket No. 1086] (the "<u>Distribution Order</u>").  The Court also entered an opinion accompanying the Distribution Order [Docket No. 1085] (the "<u>Distribution Opinion</u>").

7.     In its Distribution Opinion, the Court analyzed representative versions of Integrator Agreements and an End-User Agreement.  The Court held that these agreements "do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors."  *See* Distribution Opinion, at 25.

8.     Because Prime's Integrator Agreements and End-User Agreements created a debtor-creditor relationship with Prime, the property that comprised the Transfers to Defendant consisted of estate property.

9.     Additionally, the funds which Prime's customers transferred to Prime were commingled to the extent that it is impossible for any party to specifically identify which funds were provided to Prime by any specific customer.

10.    The fiat that customers transferred to Prime was held by Prime in "omnibus" bank accounts in Prime's name.  These omnibus bank accounts commingled fiat that customers (including Defendant if it was an End-User) transferred to Prime with fiat from Prime's many other customers and with Prime's own fiat generated from its business operations.

11.    Likewise, the crypto that customers (including Defendant if it was an End-User) transferred to Prime was held in "omnibus" digital wallets in vaults ("<u>Vaults</u>") maintained by Prime, in Prime's name, at Fireblocks LLC ("<u>Fireblocks</u>").  These omnibus digital wallets commingled the crypto that customers (including Defendant if it was an End-User) transferred to Prime with crypto from Prime's many other customers and with Prime's own crypto that it used for corporate operations and purposes.

12.     Prime attempted to keep track of the commingled fiat and/or crypto transferred by its customers by use of an internal, omnibus ledger (the "Internal Ledger").  But the Internal Ledger was poorly maintained and later intentionally corrupted by Prime.

13.     Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries.  Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and/or crypto that customers (including Defendant if it was an End-User) transferred to Prime.

14.     The Court has found that "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets" such that "the fiat held by the Debtors is not traceable" and the "the hopeless commingling would not allow the cryptocurrency to be traced."  *See* Distribution Opinion at 23–24, 27, 30.

15.     Likewise, the third-party expert retained by PCT in this matter, James P. Brennan, has confirmed that it is impossible to identify, trace, or otherwise distinguish the fiat and/or crypto that a specific Integrator transferred to Prime on behalf of its customers from the fiat and crypto provided by Prime's other customers or from Prime's own fiat and crypto.  *See* Declaration of James P. Brennan (the "Brennan Decl.").[6]

16.     In December 2021, Prime discovered it was unable to access a digital wallet (the "98f Wallet")[7] holding more than 11,000 ETH that had been transferred by one of Prime's customers.  Prime made this discovery when that customer sought to redeem ETH it had transferred to the 98f Wallet.  *See id.* at ¶¶ 114–116.

---

[6]     A copy of the Brennan Decl. is attached as Exhibit A.

[7]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f."

17. Because Prime did not possess sufficient ETH without access to the 98f Wallet to fulfill its customer's transfer requests, Prime went to the market to purchase ETH to cover the transfer requests. To fund those market purchases, Prime used fiat from its omnibus bank accounts. *See id.* at ¶¶ 117–122.

18. Prime executives admitted under oath that Prime intentionally falsified its internal records to hide the truth about its replacement ETH purchases. To hide the fact that Prime was using fiat transferred to it by customers to pay for its replacement ETH purchases, Prime created fake wire transfer entries on the Internal Ledger to make it appear that Prime received fiat wire transfers from one of the liquidity providers ("<u>Liquidity Provider</u>") who sold Prime the replacement ETH. In fact, no such fiat wire transfer deposits ever occurred:

> Q: When it says funds transfer. . . and it says "wire, wire, wire." Do you see that?
>
> A: Yes.
>
> Q: ***There were no wire transfers; right***?
>
> A: ***Yes***.
>
> Q: ***Just to be clear. Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?***
>
> A: ***Yes, there were no wire transfers***.

Deposition of ███ ███ *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "███ Dep."), 164:22–165:10 (emphasis added).

19. Prime's use of its fiat transferred by other customers to purchase replacement ETH left it with a nearly $82 million shortfall in the omnibus bank accounts that contained commingled fiat from Prime's customers.

20.     Prime's falsified wire transfer entries to cover its replacement ETH purchases, coupled with Prime's failure to properly reconcile and record other transactions on its Internal Ledger, have resulted in Prime being unable to trace specific transfers that were made by any particular customer. *See* Ex. A, Brennan Decl., ¶¶ 123–132.

21.     Prime's Transfers to Defendant during the Preference Period exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

22.     Each of the Transfers that PCT seeks to avoid was made:  (i) to or for the benefit of Integrator or one of Integrator's customers which was an End-User of Prime (*i.e.*, a creditor of Prime); (ii) on account of an antecedent debt owed by Prime to Integrator or to End-User; (iii) while Prime was insolvent; (iv) during the Preference Period; and (v) would allow Integrator or End-User to receive more than they would have received in a hypothetical chapter 7 liquidation. In short: each of the Transfers to Defendant was a preferential transfer of estate property and avoidable under section 547 of the Bankruptcy Code.

23.     Regardless of whether Defendant was an End-User, each Defendant named herein received the avoidable Transfers of estate property, net of any potential subsequent new value, as determined by PCT and its retained expert.

24.     As an End-User and/or transferee, Defendant received the Transfers either as: (i) the initial transferee of the Transfer or the entity for whose benefit the Transfer was made; or (ii) an immediate or mediate transferee of the initial transferee.

25.     Accordingly, the Transfers to each Defendant are avoidable under section 547, and also are recoverable under section 550, of the Bankruptcy Code.

-7-

26.     PCT brings this Adversary Proceeding pursuant to sections 547 and 550 of the Bankruptcy Code to avoid and recover all transfers of property and all obligations of Prime to or for the benefit of Defendant, made in the 90-day period prior to the filing of the Debtors' Chapter 11 Cases.  Each of the Transfers to Defendant alleged herein is avoidable under section 547 of the Bankruptcy Code.  Pursuant to section 502(d) of the Bankruptcy Code, PCT seeks to disallow any and all claims filed or held by Defendant in these Chapter 11 Cases unless and until Defendant has relinquished to PCT all property owed to it.

27.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to, or obligations incurred by, Defendant that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Defendant and, accordingly, reserves the right to amend this Complaint.

## PARTIES

28.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644].  The Plan was consummated on January 5, 2024 (the

"<u>Effective Date</u>").[8]  On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust.  *See* Plan, § 6.21.  The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.  *See id*. at § 1.118.

29.    Defendant Avilac Inc., a corporation maintaining a primary business address in London, received transfers from Prime of $169,146.08, net of potential subsequent new value, during the Preference Period.

30.    Defendant Eagle Communication Trade Co. Ltd., a company  maintaining a primary business address in London, received transfers from Prime of $430,085.00, net of potential subsequent new value, during the Preference Period.

31.    Defendant Games to Go, LLC, a limited liability company maintaining a primary business address in London, received transfers from Prime of $1,995,050.12, net of potential subsequent new value, during the Preference Period.

32.    Defendant HongKong Bishop Technology Co. Lim., a foreign company maintaining a primary business address in Hong Kong, received transfers from Prime of $305,768.80, net of potential subsequent new value, during the Preference Period.

33.    Defendant Ignite International Ltd., a foreign company maintaining a primary business address in London, received transfers from Prime of $500,000.00, net of potential subsequent new value, during the Preference Period.

---

[8]    *See* Docket No. 694.

34.     Defendant InTech Electronic Co. Limited, a foreign private company maintaining a primary business address in Hong Kong, received transfers from Prime of $300,046.00, net of potential subsequent new value, during the Preference Period.

35.     Defendant M&M Global Enterprises LLC, a limited liability company maintaining a primary business address in London, received transfers from Prime of $1,632,065.10, net of potential subsequent new value, during the Preference Period.

36.     Defendant Ritech Smart Technology Limited, a company maintaining a primary business address in London, received transfers from Prime of $320,038.65, net of potential subsequent new value, during the Preference Period.

37.     Defendant Yellow Spot Communications Limited, a foreign company maintaining a primary business address in Hong Kong, received transfers from Prime of $400,000.00, net of potential subsequent new value, during the Preference Period.

38.     Defendant Yue Xin Electric Technology Limited, a foreign company maintaining a primary business address in Hong Kong, received transfers from Prime of $100,000.00, net of potential subsequent new value, during the Preference Period.

## JURISDICTION AND VENUE

39.     The Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such .

. . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor." *See* Plan, § 12(c). This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust." *Id.* at §§ 12(s), (u). As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

40.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2). The Court may enter final orders in connection with the matters contained herein.

41.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, PCT confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties to this action, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

42.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

43.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

44.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing

-11-

to pay.  BTC and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

45.    All cryptocurrencies exist on a "blockchain." A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order — thus, a "block"-"chain."

46.    There are many different blockchains.  The first and most popular blockchain was the Bitcoin blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain, are referred to as "ERC-20" tokens.

47.    Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

48.    "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used

to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

49.     Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

50.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

51.     A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

52.     A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method. These types of physical hardware devices are provided by companies such as Trezor:



53.     Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet.

However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to initiate transfers of crypto kept in the digital wallet. Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

54.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed. They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## GENERAL ALLEGATIONS

### I.     Prime's Business Operations

55.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

56.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

57.     In the years that followed, as the crypto market grew, Prime shifted its focus away from traditional assets and towards the crypto industry.

58.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state money-transmitter licenses (each, a "MTL") required to conduct money transmission.

59.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

60.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

61.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

62.     A significant number of Prime's customers were sophisticated crypto and digital asset companies that contracted with Prime through various contractual service-related agreements.  Prime referred to these customers as Integrators.  Integrators directly accessed services provided on Prime's platform through an API provided to the Integrator.

63.     Integrators also acted as integrators between their own respective customers (*i.e.*, the End-Users) and Prime, which allowed the End-Users to also utilize Prime's services.

-15-

64. End-Users did not directly procure Prime's services, but, instead, accepted or agreed to the End-User Agreement with Prime that was presented to them by the Integrator through the Integrator's system.

## II. Prime's Integrator and End-User Agreements Created a Debtor-Creditor Relationship Between Prime and its Customers

65. In its Distribution Opinion, the Court analyzed whether fiat and crypto held by the Debtors were property of the Debtors' estates. *See generally* Distribution Opinion. Several parties (the "Objectors") objected to the Plan Administrator's request for the Court to rule that the fiat and crypto held by the Debtors constituted property of the Debtors' estates. *See id.* at 1–2.

66. Integrators and End-Users originally transferred assets to Prime pursuant to either Integrator Agreements or End-User Agreements.

67. The Court analyzed whether representative versions of Integrator Agreements and an End-User Agreement created a trust relationship between Prime and the Integrators and/or End-User. The Court held that the agreements "submitted into evidence do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors." *See id.* at 25; *see also id.* at 24 ("The Objectors have not established that a trust relationship was formed.").

68. The relevant Integrator Agreements and End-User Agreements here, similar to the agreements addressed by the Court in the Distribution Opinion, do not establish that a trust relationship exists between End-Users, Integrators, and/or the Debtors.

69. Accordingly, Prime's relationship with its customers was a debtor-creditor relationship.

III.   **The Preferential Transfers to Defendant**

    A.    **The Transfers**

70.    During the Preference Period, Prime transferred fiat and/or crypto to Defendant, by or on behalf of Integrator and/or End-User.  *See* Ex. A, Brennan Decl., Ex. 4.

71.    The specific Prime entity that made the Transfers to Defendant was Prime Trust, LLC.

72.    Exhibit 4 to the Brennan Declaration sets forth the amount of fiat and/or crypto transferred from Prime to Defendant, which is net of any potential subsequent new value that Defendant transferred to Prime during the Preference Period.  *See* Ex. A, Brennan Decl., Ex. 4.

73.    Thus, Defendant's preference exposure is no less than the amount of fiat and/or crypto alleged herein for Defendant.

    B.    **The Transfers Are Avoidable**

74.    Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

75.    First, the transfer must be "to or for the benefit of a creditor."  11 U.S.C. § 547(b)(1).

76.    Second, the transfer must be "for or account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

77.    Third, the transfer must have been "made while the debtor was insolvent."  11 U.S.C. § 547(b)(3).

78.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

-17-

79.     Fifth, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would have received in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

80.     Prime made the Transfers to or for the benefit of Integrator or one of Integrator's customers which was an End-User of Prime (*i.e.*, creditors of Prime).

81.     Prime made the Transfers on account of the antecedent debt Prime owed to Integrator or Integrator's customers which were End-Users of Prime through End-User Agreements by way of the debtor-creditor relationship created between those parties through Integrator's Integrator Agreements or End-User Agreements.

82.     Prime made the Transfers while it was insolvent.  As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[9] Prime is nonetheless presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

83.     If not avoided, the Transfers would enable Integrator or one of Integrator's customers which was an End-User of Prime to receive more than they would have received on account of their claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers.[10]

---

[9]     *See Schedules of Assets and Liabilities for Prime Core Technologies Inc.*, (Case No. 23-11161) [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC*, (Case No. 23-11162), [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC*, (Case No. 23-11164) [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC*, (Case No. 23-11168) [Docket No. 178].

[10]    *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

84.     Prime made the Transfers to Defendant during the 90-day Preference Period immediately preceding the Petition Date (*i.e.*, between May 16, 2023 and August 14, 2023).

85.     Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Transfers during the Preference Period by PCT and the third-party expert retained in this matter, PCT has determined that it may avoid the Transfers even after taking into account potential affirmative defenses.[11]

86.     Accordingly, the Transfers to Defendant during the 90-day Preference Period immediately preceding the Petition Date were preferential transfers pursuant to section 547(b) of the Bankruptcy Code and are subject to avoidance.

87.     The avoidable preferential Transfers are recoverable from each Defendant as either: (i) the initial transferee of such transfer or the entity for whose benefit the transfer was made; or (ii) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550.

88.     Thus, PCT may recover the Transfers, or the value thereof, from Defendant.

89.     During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Defendant during the Preference Period.  It is PCT's intention to avoid and recover all Preference Period transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Defendant or any other transferee.  PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revisions to Defendant's name; (iv) additional defendants; and/or (v) additional causes of action, if

---

[11]  It is Defendant's obligation to establish any affirmative defenses it asserts in this action, including any subsequent new value defense.

applicable (collectively, the "<u>Amendments</u>"), that may become known to PCT at any time during this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint

## IV. <u>The Fiat and/or Crypto That Customers Transferred to Prime Is Not Traceable</u>

### A. Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name

90.     The fiat that customers transferred to Prime was not segregated into separate bank accounts.  *See* <u>Ex. A</u>, Brennan Decl., ¶ 85.  Instead, the fiat was held in omnibus bank accounts in Prime's name containing fiat that other customers transferred to Prime as well as fiat that Prime generated from its own business operations.  *See id.*

91.     Prime maintained bank accounts primarily at BMO Harris Bank, N.A. ("<u>BMO</u>"), Cross River Bank ("<u>CRB</u>"), Signature Bank ("<u>Signature</u>"), and Royal Business Bank ("<u>RBB</u>").  *See id.* at ¶ 12.  Prime maintained these bank accounts in its own name.

92.     Prime regularly transferred fiat between its various omnibus bank accounts, further commingling funds.  *See id.* at ¶¶ 87–92.

93.     For example, Prime used one BMO account ("<u>BMO x3077</u>") primarily to make wire transfers.  *See id.* at ¶ 89.

94.     BMO x3077 held commingled funds that it regularly received from other Prime omnibus bank accounts and from other Prime customers.  *See id.* at ¶¶ 90–95.

95.     At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("<u>BMO x9934</u>"), because the latter account offered a higher rate of interest.  *See id.* at ¶¶ 92.

96.     The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id*. at ¶ 93.  Because the funds in BMO x3077 were commingled, BMO x9934 also contained commingled funds.  *Id.*

97.     In addition to commingled funds from BMO x3077, BMO x9934 contained some funds transferred from other sources, such as Prime's accounts at CRB and Signature.  *Id.*

98.     Prime's omnibus accounts at CRB and Signature operated in a largely similar manner as BMO x377—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers.  *See id.* at ¶ 94.

99.     For instance, CRB account ("CRB x9892") and CRB account ("CRB x4453") were omnibus bank accounts at CRB utilized by Prime.  *See id.* at ¶ 95.  These accounts were used primarily for internal transfers and payments via automated clearinghouse ("ACH").  *See id.*  Prime used BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH.  *See id.*

100.     Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.  *See id.* at ¶¶ 88–89, 95.

101.     Prime typically made transfers between its omnibus bank accounts in round numbers, without reference to any specific transactions.  *See id.* at ¶ 98.  This suggests that Prime simply moved funds between its omnibus bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *Id.*

102.    Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and omnibus bank accounts that contained fiat transferred to Prime by its customers. *See id.* at ¶ 87.

### B.    Prime Commingled Crypto in Omnibus Digital Wallets in Vaults

103.    Similar to its handling of fiat, Prime did not maintain separate or segregated digital wallets for crypto. *See id*. at ¶ 28. Instead, Prime had omnibus digital wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes. *See id.*

104.    Prime maintained its omnibus digital wallets in Prime's Vaults at Fireblocks, a third-party crypto security platform. *See id.* at ¶ 29. Prime used Vaults within the Fireblocks' infrastructure to: (1) organize wallets (including the omnibus digital wallets), (2) enhance security measures, and (3) leverage efficient transaction policies and access controls. *See id*. Vaults are Fireblocks were not separated or segregated by digital wallets. *See id*.

105.    Customers were provided with deposit digital wallet addresses (the "Deposit Digital Addresses") for sending crypto to Prime. *See id.* at ¶ 30. From time to time, Prime would conduct "sweeps" of those different Deposit Digital Addresses to transfer crypto from those Deposit Digital Addresses into one or more of the shared omnibus digital wallets controlled by Prime. *See id*. at ¶ 31. This process commingled crypto transferred to Prime by different customers together in the omnibus digital wallets. *See id*.

106.    Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards. *See id.* at ¶¶ 32–34. Prime's application could trigger a sweep based on

certain unknown events occurring or an employee could manually perform a sweep at any given time. *See id.*

107.    Prime also regularly transferred crypto between its multiple omnibus digital wallets, only further commingling the already commingled crypto contained in the omnibus digital wallets. *See id.* at ¶ 33.

108.    In an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to and from Prime on its Internal Ledger. *See id.* at ¶ 34. When a customer transferred crypto to Prime, Prime would credit that amount on its Internal Ledger. *See id.* The Internal Ledger, however, did not track to which omnibus digital wallet(s) any specific crypto was transferred into when Prime swept Deposit Digital Address(es). *See id.* at ¶ 35.

109.    When a customer requested to transfer crypto from Prime, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the outgoing transfer amount. *See id.* at ¶ 40. If the customer had transferred sufficient crypto, Prime would then check its multiple omnibus digital wallets to determine from which omnibus digital wallet(s) it could transfer the requested amount of crypto to the customer. *See id.* In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Deposit Digital Address because Prime's omnibus digital wallets did not segregate crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer. *See id.*

110. To demonstrate the extent of Prime's commingling of crypto, the Brennan declaration discusses and illustrates examples of commingling taken from transaction, blockchain, and other data. *See id.* at ¶¶ 41–84.

111. For example, Prime often used the digital wallet with a digital address ending in ~73ck ("~73ck Wallet") for BTC transferred to Prime from numerous customers as well as BTC transferred from other Prime omnibus digital wallets, which also held BTC transferred to Prime by multiple customers. *See id.* at ¶¶ 41–43. This resulted in extensive commingling of BTC.



*See id.* at ¶ 54.

### C. Prime Pooled Crypto to Reduce Transaction Fees

112. Prime generally swept crypto from the Deposit Digital Addresses into shared omnibus digital wallets to pool crypto together for a number of reasons. *See id.* at ¶¶ 44–52.

113.    One primary reason for pooling crypto together was that Prime and its customers could bypass and save on various transaction fees[12] that would otherwise be incurred by conducting transactions on the blockchain.  *See id.* at ¶¶ 64–67.  Specifically, for crypto transfers within a single Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather than conduct any transactions on the blockchain which would otherwise incur transaction fees.  *See id.*  When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions and performing them during off-peak hours when the blockchain network was less congested as illustrated in the below diagram:



---

[12]    Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to costs that blockchain users must pay to network validators for their participation in validating transactions on the blockchain.  In other words, they are fees charged by the blockchain itself for successfully completing a transaction.  However, on the Bitcoin blockchain, these are referred to simply as "transaction fees."  Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."  In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain."  *See* Ex. A, Brennan Decl., ¶¶ 24–25.  We use "transaction fees" to refer to both "gas fees" and BTC transaction fees herein, but only use the term "gas fees" to refer to transaction fees incurred for ETH and USDT on the Ethereum network.

*See id.* at ¶¶ 67, 69.

114. By sweeping BTC together that had been transferred to Prime by multiple customers, including certain Defendants named herein, Prime's commingling of BTC makes distinguishing the original digital wallet from which the BTC originated from nearly impossible. *See id.* at ¶ 72.

### D.   Prime Had Inadequate Reconciliation Processes

115. Because Prime did not segregate the fiat and crypto transferred to it by one customer from the fiat and crypto transferred to it by another customer, or from the fiat or crypto generated by Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts owed on an Internal Ledger. *See id.* at ¶ 86.

116. However, Prime's inadequate internal cash management practices make identifying which bank account transfers corresponded with which specific customer fiat transactions reported on Prime's Internal Ledger extremely difficult. *See id.* at ¶¶ 100–107.

117. Likewise, because Prime did not conduct regular, timely or accurate reconciliations to compare the crypto recorded on its Internal Ledger with the crypto that Prime actually held in its omnibus digital wallets, none of the crypto in Prime's Vaults with Fireblocks has clear ownership provenance. *See id.* at ¶¶ 108–113.

118. ███████ ████ ("██████ Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Internal Ledger to determine the amounts of fiat or crypto that Prime owed to its customers:

> Q:   And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?

A:    I would pull the general ledger record out of the Prime Trust Core system.

Deposition of ████ ████ *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov.

16, 2023) (the "████ Dep."), 89: 19–25.

119.    Prime maintained substandard reconciliation processes throughout its history,

including with respect to its Internal Ledger.  *See* Ex. A, Brennan Decl., ¶¶ 100–113.  This further

hindered the ability of Prime or anyone else to specifically identify which fiat or crypto had been

transferred to Prime by which customer.  *Id.*

120.    Prime did not perform regular reconciliations of its assets and, at least prior to

March 2021, any reconciliations that Prime did conduct were manual.  *See id.* at ¶ 103.

121.    Former Prime employees testified that Prime commingled fiat and crypto

transferred to Prime by its customers and that Prime's reconciliation processes were poorly

maintained.

122.    ████ testified that "[r]econciliations were not being done in a timely manner."

████ Dep., 38: 23–24.

123.    ████ ████ ("████ Prime's former Chief Financial Officer, testified:

Q:    Are you aware of any instances in which what would be considered
customer assets were commingled with company assets in an account?

A:    I think there were instances where that did happen based off of the
management in the financial operations team where we might have had
balances that they might have commingled, but I don't remember the—I
don't remember how that happened.

Deposition of ████ ████ *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del.

Nov. 16, 2023), 41:19–42:4.

124.    ████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been."  *See id.* at 213:15–22.

125.    ████ also testified about Prime's reconciliations processes both before and after March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

████ Dep., 19:23–20:5.

126.    ████ prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

| 2 | Finding and Response Summary Matrix | | | | | | |
|---|---|---|---|---|---|---|---|
| Risk | Reference | Finding | Target | Response | Completed | Verified | |
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | | |

127.    The below testimony from ▮▮▮ demonstrates that Prime's regular practices of commingling assets and maintaining poor records resulted in Prime's own employees being incapable of determining exactly where assets transferred by a particular party were located:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:    It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:    And that was done at Prime Trust?

A:    It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:    And do you know who was responsible for those accounts?

A:    I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

▮▮▮ Dep., 205:19–207:3.

E.     **The Fiat and/or Crypto that Customers Transferred to Prime Cannot be Traced**

128.    Prime's commingling of fiat and crypto in omnibus bank accounts and omnibus digital wallets, coupled with its poor recordkeeping procedures and, as detailed below, its eventual intentional falsification of internal records, make it impossible for PCT, Defendant, or anyone else to trace and specifically identify the fiat and/or crypto that any Prime customer originally transferred to Prime. *See generally* Ex. A, Brennan Decl.

129.    The impossibility of tracing fiat and/or crypto that had been transferred to Prime by a customer already has been determined by the Court.  In its Distribution Opinion, dated July 18, 2025, the Court, after noting that "[t]he case ultimately turns on the fact that creditors' assets cannot be separately identified, segregated, traced or otherwise specifically identified," concluded that (1) "[t]he overwhelming evidence establishes that the Debtors hopelessly commingled assets" such that (2) "the fiat held by the Debtors is not traceable" and (3) "the hopeless commingling would not allow the cryptocurrency to be traced." *See* Distribution Opinion at 23–24, 27, 30.

130.    For the reasons stated by the Court in its Distribution Opinion and alleged above, the fiat and/or crypto that customers transferred to Prime during the Preference Period is impossible to trace.

131.    Accordingly, the Transfers are avoidable and must be returned to PCT.

V.    **The 98f Wallet**

A.    **Prime Discovers It Has Lost Access to the 98f Wallet**

132.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime. *See* Ex. A, Brennan Decl., ¶ 115.  Subsequently, between

-30-

December 2021 and March 2022, Abra continued to request that Prime transfer ETH totaling 48,034.57 ETH (worth approximately $145,000,000 at the time). *See id.* at ¶ 119.

133.    In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its omnibus digital wallets:

primetrust.com

2021-12-22 07:16:57.000 PM

Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know (            and @              are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

134.    Further investigation revealed that, for approximately eight months, Abra had been transferring significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.

135.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet. *See* Ex. A, Brennan Decl., ¶ 116.

136.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.

137.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet. *See*     Dep., 69:17–71:22. Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet. *See*     Dep., 181:6–8. Prime also did not possess and could not locate the passwords (called

"seed phrases") that were associated with these physical hardware devices connected to the 98f

Wallet. *See id.*

138.    As such, Prime had no way of accessing the 98f Wallet.  The crypto stored therein

was effectively lost to Prime, leaving a significant hole in Prime's finances.

### B.    Prime Uses Fiat From its Omnibus Bank Accounts to Purchase Replacement Crypto

139.    Prime was concerned about the negative impact and consequences it would suffer

from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal

that it had lost access to a digital wallet containing a significant amount of crypto.

140.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain

executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank

accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy

Abra's transfer requests.  *See* Ex. A, Brennan Decl., ¶ 117.

141.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different

on-chain purchases of ETH from Liquidity Provider to attempt to satisfy Abra's withdrawal

requests as reflected in the chart below.  *See id.* at ¶ 119.

| Date | ETH On-Chain Transfers |
|------|------------------------|
| 12/23/2021 | 2,999.99 |
| 12/31/2021 | 3,250 |
| 1/6/2022 | 800 |
| 1/6/2022 | 2,100 |
| 1/21/2022 | 1,930.50 |
| 3/11/2022 | 1,800 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000 |
| 3/29/2022 | 2,347.22 |
| 3/30/2022 | 2,300 |

142.    The funds for each of these ETH purchases came from Prime's omnibus, commingled bank accounts.  *See id.* at ¶¶ 120–122.  The ETH purchased with those commingled funds was then transferred to Abra.  *See id.* at ¶ 52.

143.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, ███ ███

> Q:    So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to ███ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?
>
> A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, ███ would know specifically.

Deposition of ███ ███ *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

144.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.

**C.    Prime Corrupts and Falsifies its Internal Ledger in an Attempt to Conceal Its Use of the Omnibus Fiat**

145.    Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat from omnibus bank accounts to purchase ETH to satisfy Abra's outgoing transfer requests. *See id*. at ¶ 123.

146.    Prime executives discussed how to hide these transactions from auditors at Nevada FID:



147.    ▮ confirmed in his deposition that Prime executives intentionally chose to settle and record the purchases of ETH from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider. *See* ▮ Dep., 153:8–13.

148.    These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat that Prime held in its omnibus bank accounts. *See* Ex. A, Brennan Decl., ¶¶ 126–127.



149.    ███ further testified about Prime's internal "inflat[ed]" Internal Ledger compared to the fiat in Prime's omnibus bank accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:    Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see.  But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.

███ Dep., 144:11–20, 146:7–15.

150.     ⬛ explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Abra on Prime's Internal Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:

Q:     And FID is Nevada Financial Institution Division; right?

A:     I think so.  Yeah.

Q:     And so, what is ⬛ talking about when he's saying "minimizing FID scrutiny during audit time"?

A:     It wasn't a—I think what he's saying is, you know, when FID comes to do their regular—regulatory reviews with us, you know, how do—how do they get around—or not get around, but how do they minimize, you know, the scrutiny that FID would come down on Prime Trust for doing this.

Q:     So Roger's saying, it sounds like, it would be easier to hide it from FID if we do it internally as opposed to externally; is that right?

A:     That's—that's what he was trying to do, yeah.

*Id*. at 152:18–153:13.

151.     Prime executives seem to have undertaken efforts to make Internal Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.  *See* Ex. A, Brennan Decl., ¶¶ 128–130.

152.     As demonstrated by the illustrative chart below[13], Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

---

[13]     This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | Total | 76,367,547.90 |

*See id.* at ¶ 128.

153.    None of these wire transfers appear on Prime's bank account statements because they did not actually occur.  *See id.* at ¶ 129.

154.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries on its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally falsify Prime's internal records compounded the already impossible task of untangling or segregating the fiat and crypto transferred to Prime by different customers and the fiat and crypto that Prime generated from its business operations.  *See id.* at ¶ 132.

155.    Another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from Abra:



156. ▮ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

> On Mon, Dec 19, 2022 at 9:28 AM ▮▮▮▮ rimetrust.com> wrote:
>
> He▮
> Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger? If so, I don't believe any specific bank accounts were used, as management considered all funds tangible in our omnibus model. In their decision, no bank movements were needed/done before the credits were requested to the ledger.

157. ▮▮▮▮ Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":

> On Wed, Dec 28, 2022 at 10:56 A̶M̶ ███████████ ▓rimetrust.com> wrote:
>
> ███████ and I met today. We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure. Please let us know if we need to have another conversation to align how to position this with the FID.

## VI. Prime's Financial Conditions Spiral Downward and Culminate in Its Filing the Chapter 11 Cases

158.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

159.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—were leaking to the crypto and financial markets.

160.    On May 25, 2023, Prime's CEO met in person with Nevada FID during which Prime was told that they would likely be shut down in the near future.

161.    Prior to May 25, 2023, documentary evidence reflects that Prime's CEO had been relaying to other market participants Prime's bleak financial condition and the likelihood that Nevada FID would shut them down.

162.    During the lead up to the May 25, 2023 meeting with Nevada FID and shortly thereafter, in response to confirmed rumors of Prime's financial condition, many of the industry's largest market participants were demanding transfers from Prime.

163.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime. *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK

(Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/. CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy." *Id.*

164.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order"). Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023), https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf. Nevada FID ordered Prime to cease accepting all fiat and crypto deposits. *Id.*

165.    The next day, BitGo canceled its acquisition of Prime. One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023), https://www.coindesk.com/business/2023/06/22/crypt-custody-firm-bitgo-cancels-prime-trust-acquisition/.

166.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court"). *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime*

-40-

*Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.   The Nevada FID Petition directed Prime to cease and desist all retail trust activities.  *Id.*

167.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

168.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***."  *Id.* at 6 (emphasis added).

169.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals."  *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)."  *Id.* at 7.

170.    On July 14, 2023, the Nevada Court placed Prime under receivership.

171.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfer,
### 11 U.S.C. § 547(b)

172.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

173.     Each of the Transfers to Defendant was a transfer of an interest in property of Prime.

174.     Prime made each of the Transfers to or for the benefit of Integrator or one of Integrator's customers which was an End-User of Prime.

175.     At the time of the Transfers, Integrator and Integrator's customers were creditors of Prime within the meaning of section 101(10) of the Bankruptcy Code.

176.     The Transfers were made for or on account of an antecedent debt owed by Prime.

177.     The Transfers were made within ninety days of the Petition Date.

178.     At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

179.     If not avoided, the Transfers would enable Integrator or one of Integrator's customers which was an End-User of Prime to receive more than it would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

180.     Defendant has not repaid or returned any of the Transfers to PCT.

181.     Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses, including potential defenses under section 547(c) of the Bankruptcy Code, and believes the Transfers are avoidable.

182.     Accordingly, PCT is entitled to avoid the Transfers to Defendant identified, as to Defendant, in Exhibit A, Brennan Declaration, Exhibit 4, as a preference pursuant to section 547(b) of the Bankruptcy Code.

## Count II
### Recovery of Avoided Transfers from the Defendant,
### 11 U.S.C. § 550

183.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

184.    PCT is entitled to avoid the preferential Transfers described above pursuant to section 547(b) of the Bankruptcy Code.  Defendant was the initial transferee of such Transfer or the entity for whose benefit such transfer was made; or the immediate or mediate transferee of such initial transferee.

185.    Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Defendant the Transfers identified, as to Defendant, in Exhibit A, Brennan Declaration, Exhibit 4, as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## Count III
### Claim Objection, 11 U.S.C. § 502

186.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

187.    As alleged above, Defendant was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferee, or the persons for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to section 547(b) of the Bankruptcy Code, which is recoverable from Defendant under section 550 of the Bankruptcy Code.

188.     Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Defendant that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Defendant pays PCT the value of the Transfers, for which and to the extent that the Court has determined Defendant is liable pursuant to section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.     Enter an order finding that the fiat and/or crypto Transfers addressed herein, and identified in Exhibit A, Brennan Declaration, Exhibit 4, are an avoidable preferential transfer under 11 U.S.C. § 547;

B.     Award PCT:  (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfer alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, that were made to Defendant;

C.     Enter an order disallowing, pursuant to 11 U.S.C. § 502(d), any and all claim(s) filed or held by Defendant against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Defendant relinquishes to PCT the amount ordered as an award for the avoidable transfers;

D.     Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.     Grant PCT all other relief, at law or equity, to which it may be entitled.

-44-

Dated: August 14, 2025

**WOMBLE BOND DICKINSON (US) LLP**

By: /s/ *Morgan L. Patterson*
Donald J. Detweiler (Del. Bar No. 3087)
Morgan L. Patterson (Del. Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: don.detweiler@wbd-us.com
          morgan.patterson@wbd-us.com

*-and-*

**ASK LLP**

By: /s/ *Joseph L. Steinfeld, Jr.*
Joseph L. Steinfeld, Jr., Esq., MN SBN 0266292
Nicholas C. Brown, Esq., VA SBN 99898
(admitted *pro hac vice*)
2600 Eagan Woods Drive, Suite 400
St. Paul, MN 55121
Telephone: (651) 289-3867
Fax: (651) 406-9676
Email: jsteinfeld@askllp.com
          nbrown@askllp.com

*-and-*

Edward E. Neiger, Esq.
60 East 42nd Street, 46th Fl.
New York, NY 10165
Telephone: (212) 267-7342
Fax: (212) 918-3427

*Counsel for Plaintiff*

Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Prime Core Technologies Inc., *et al.*,[1] | Case No. 23-11161 (JKS) |
| Debtors. | (Jointly Administered) |
| PCT Litigation Trust,[2] | |
| Plaintiff, | |
| v. | Adv. Proc. No. 25-      (JKS) |
| Avilac Inc.; Eagle Communication Trade Co. Ltd.; Games to Go, LLC; Hong Kong Bishop Technoogy Co. Lim.; Ignite International Ltd.; InTech Electronic Co. Limited; M&M Global Enterprises LLC; Ritech Smart Technology Limited; Yellow Spot Communications Limited; Yue Xin Electric Technology Limited, | |
| Defendants. | |

## DECLARATION OF JAMES P. BRENNAN

Under 28 U.S.C. § 1746, I, James P. Brennan, declare as follows under the penalty of perjury:

## I.    My Background

1.       I am a forensic accountant with over 20 years of experience conducting analyses and

providing expert testimony in matters involving accounting fraud, Ponzi-schemes, financial crimes,

---

[1]    The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime").  The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]    PCT Litigation Trust ("Plaintiff" or "PCT") was established for the primary purpose of pursuing litigation and distributing assets.  PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.

and asset-tracing and recovery.  I have experience in forensic accounting and investigations in fiat and cryptocurrency.

2.      I am a Senior Managing Director and Global Head of Fintech, Payments, and Crypto Compliance and Investigations at J.S. Held.  J.S. Held is a global professional service firm which provides technical, scientific, and financial advisory services.

3.      Prior to working at J.S. Held, I held positions at other investigation firms, including FTI Consulting, Alvarez & Marsal, and Kroll.  In these positions, I managed teams responsible for investigations involving money laundering, terrorist financing, Ponzi-schemes, asset theft, and other fraudulent activities, as well as asset-tracing and recovery.

4.      I hold both a B.S. and a M.S. in accounting from St. John's University.  I am a Certified Fraud Examiner and a Certified Bitcoin Professional.

5.      A copy of my resume is attached hereto as **Exhibit 1**.

6.      I specialize in accounting, forensic investigations, and disputes involving complex economic and financial transactions.  A significant amount of my practice and experience involves advising on crypto-related matters.

7.      I am routinely retained to perform analyses of information related to financial crimes, which include forensic investigations and flow-of-funds analyses related to crypto digital wallet addresses and fiat bank accounts.

8.      I am familiar with the forensic tools and methodologies used for conducting investigations related to both fiat and cryptocurrency in criminal, civil, bankruptcy, and regulatory matters.

9.      I also train domestic and international government entities concerning cryptocurrency and financial crimes.  These entities include, among others, the U.S. Department of Justice, U.S. Department of Homeland Security, and U.S. Bankruptcy Courts.

10.      I submit this declaration (this "Declaration") in support of PCT's complaint against each of the above-named Defendants, individually (each a "Defendant" herein).

11.      In connection with this Declaration, I reviewed testimony from former Prime executives and employees.

12.      I also reviewed Prime's bank account information at various financial institutions, including BMO Harris ("BMO"), Cross River Bank ("CRB"), Signature Bank ("Signature"), and Royal Business Bank ("RBB"), Prime's Internal Ledger (the "Internal Ledger"), API Log audit data, bank statement data, and blockchain data.

13.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (i) my personal knowledge and/or on information provided to me by Prime, former Prime management and employees, Wind-Down Debtor, the Plan Administrator, and/or the Plan Administrator's professionals; or (ii) my review of relevant documents.

14.      Except as otherwise indicated herein, all conclusions and opinions set forth in this Declaration are based on: (i) the facts as known to me, including those set forth herein; (ii) my experience and knowledge of Prime's operations; and (iii) my experience and training as a professional.

15.      The opinions and conclusions expressed herein are subject to change based on additional data, facts, and information that may be received after this Declaration is executed, including, among other things, additional data, facts, and information that becomes available in the

public domain or that is made available by the Wind-Down Debtor, the Plan Administrator, or other parties during discovery or otherwise.

## II.    Background on Crypto

16.    The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens." Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ether ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other cryptocurrencies.

17.    All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transaction in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all the cryptocurrency transactions that occurred on the blockchain at a particular point in time.  Those "blocks" are all reflected on the blockchain and are ordered by date in a "chain"—a "block"-"chain."

18.    There are a number of different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH.  The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain.  Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

-4-

19.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique Ethereum digital addresses, which are derived from public keys. These Ethereum digital addresses are 40-character hexadecimal strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these digital addresses, including any time crypto is traded or any time a smart contract is used.

20.     Similarly, on the Bitcoin blockchain, digital wallets and their respective holdings are identifiable to the public by unique Bitcoin digital addresses, which are derived from public keys. Bitcoin digital addresses are shorter, hashed versions of public keys, which are digital addresses with long alphanumeric strings.

21.     "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain wallet.  Like public keys, private keys similarly consist of multi-digit alphanumeric strings.  However, unlike public keys—which are knowable by the public and used simply to identify a digital address—private keys are known only by the owner of the digital wallet and used by the owner to access and manage the digital wallet.

22.     Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets have no third party that is taking custody of the crypto.

23.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures" to access and transact with the crypto stored on the digital wallet.

24.     Transactions occurring on the blockchain incur fees.  On the Ethereum blockchain, these are referred to as "gas fees."  Gas fees refer to the costs that blockchain users must pay to

-5-

network validators for their participation in validating transactions on the blockchain. In other words, they are fees charged by the blockchain itself for successfully completing a transaction on the blockchain. The exact amount of gas fees for a particular transaction can fluctuate based on factors such as the size of the transaction, supply, demand, and network activity at the time the transaction is made.

25. However, on the Bitcoin blockchain, these are referred to simply as "transaction fees." Transaction fees refer to the costs that blockchain users pay to bitcoin miners as an incentive for preventing network congestion and incorporating a transaction in the subsequent "block."[3] In other words, they are rewards paid to miners for facilitating the successful completion of a transaction on the blockchain. Similar to gas fees in the case of ETH, the exact price of the transaction fee for a particular Bitcoin transaction can fluctuate based on factors such as the size of the transaction (in terms of bytes), supply, demand, and network activity at the time the transaction is made.

26. Furthermore, a key distinction in how transaction fees are determined on the Bitcoin network compared to other blockchains is the protocol's Unspent Transaction Output ("UTXO") model.[4] While other blockchains such as Ethereum utilize an account-based system, where digital wallet balances are adjusted based on transaction activity, Bitcoin's system is often compared to physical cash because the "input"[5] for a Bitcoin transaction is typically compiled of various UTXOs (representing various amounts of BTC) that it previously received. If the value of the UTXO is not

---

[3]   *See* FIDELITY DIGITAL ASSETS, "Bitcoin and Ethereum Fees Explained," *available at*: https://www.fidelitydigitalassets.com/research-and-insights/bitcoin-and-ethereum-fees-explained.

[4]   A UTXO is the "unspent" amount of BTC or "change" that is left over from a digital wallet sending BTC to another digital wallet.

[5]   An "input" is the amount of BTC being sent from a digital wallet to another digital wallet.

the exact equivalent of the desired amount, "change" is then sent back to the sender in the form of a new UTXO.[6]



27.    The number of UTXOs (representing various amounts of BTC) in a transaction impacts its data size, and this in turn is reflected in the transaction fee.  The more UTXOs (representing various amounts of BTC) required to complete the transaction, the higher the cost of processing it will be.[7]  This is because transaction fees are calculated by a certain number of satoshis[8] (0.00000001 BTC) per byte of data.[9]  Oftentimes, sophisticated traders or entities will consolidate their UTXOs (representing various amounts of BTC) by sending funds to themselves during off-peak hours, to reduce the transaction fee for when they send the funds outward in the future.

---

[6]    *See* KRAKEN, "What is a Bitcoin unspent transaction output (UTXO)?", *available at*: https://www.kraken.com/learn/what-is-bitcoin-unspent-transaction-output-utxo.

[7]    *See* RIVER, "Bitcoin's UTXO Model: What Is It and How to Manage UTXOs", *available at*: https://river.com/learn/bitcoins-utxo-model/.

[8]    A satoshi is the smallest unit of Bitcoin and essentially measures the size of the transaction.

[9]    *See* BITSTAMP, "How are BTC transaction fees determined?", *available at*: https://www.bitstamp.net/learn/blockchain/how-are-btc-transaction-fees-determined/.

III.     **Prime's Crypto Commingling**

28.      Prime did not maintain separate or segregated digital wallets for crypto that its customers transferred to Prime.  Rather, Prime held and commingled the crypto transferred by its various customers in omnibus digital wallets ("Omnibus Digital Wallets"), where it was further commingled with crypto that Prime used for its own corporate operations and purposes.

29.      The shared Omnibus Digital Wallets were contained in Prime's vaults ("Vaults") with Fireblocks LLC ("Fireblocks").[10]  Prime used Vaults within its Fireblocks infrastructure to organize digital wallets (including the Omnibus Digital Wallets), to implement increased security measures, and to take advantage of efficiencies in transaction policies and other access controls.

30.      Each Prime customer was provided with its own unique deposit digital wallet address ("Deposit Digital Address") in order to transfer crypto to Prime.

31.      Prime would periodically "sweep," in other words, collect, all of the crypto that had been transferred to Deposit Digital Addresses and then transfer that crypto to one or more of the shared Omnibus Digital Wallets controlled by Prime.  This "sweeping" or collection process commingled the crypto that various customers transferred to Prime.

32.      Prime utilized inconsistent methods for sweeping Deposit Digital Addresses.  Prime maintained an application that could trigger a sweep based on certain events occurring such as a withdrawal request.  A Prime employee also could manually perform a sweep at any given time.

---

[10]    Fireblocks is a third-party crypto security platform which provides infrastructure for moving, storing, and issuing crypto.  Prime used Fireblocks to hold and manage its crypto.  "Vaults" are storage solutions for crypto that group multiple digital wallets in a single, central location.  "Vaults" can be managed more efficiently as a group and provide enhanced security across all digital wallets within a Vault.

33.     Prime regularly transferred crypto between its Omnibus Digital Wallets, further commingling the crypto that customers transferred to Prime.  It does not appear that Prime used a consistent or defined process for transfers between its Omnibus Digital Wallets.

34.     Since Prime did not maintain segregated digital wallets for each of its customers and the crypto at Prime was commingled (similar to fiat), Prime was forced to rely on its Internal Ledger to attempt to keep track of how much crypto Prime owed each of its customers.

35.     Prime would credit a customer's balance on its Internal Ledger for any crypto that a customer sent to Prime through its unique Deposit Digital Address.  The Internal Ledger did not (and could not) track which of the Omnibus Digital Wallets held the specific crypto that a customer had originally transferred to Prime because that crypto was commingled with crypto other customers had transferred to Prime as well as with Prime's own crypto within and across multiple Omnibus Digital Wallets.

36.     Prime implemented various mechanisms to minimize transaction fees paid on crypto transfers.  For example, Prime implemented a Gas Station mechanism to reduce the payment of gas fees on the Ethereum blockchain by consolidating ETH, USD Coin ("USDC"), or Tether ("USDT") transactions, respectively.  In doing so, the transfer of ETH, USDC, or USDT between various Deposit Digital Addresses, Prime Omnibus Digital Wallets, and Prime Gas Station Wallets further commingled the crypto held at Prime.

37.     Likewise, for BTC transactions, Prime minimized transaction fees by sweeping UTXOs (representing various amounts of BTC) into the transaction, also resulting in further crypto commingling when Prime transferred BTC between various Deposit Digital Addresses and Prime Omnibus Digital Wallets.

38.     Based on my experience, Prime's haphazard transferring of crypto, lack of defined processes and procedures, and deficient record keeping are red flags of potential fraud.  At a minimum, they demonstrate poor asset management and suggest that Prime was moving crypto around to manage customers' outgoing transfer requests or Prime's own needs without consideration of the ultimate negative impact such management had on the business overall.

39.     Prime did not perform regular reconciliations to compare the crypto recorded in its Internal Ledger with the crypto Prime actually held in its Omnibus Digital Wallets.

40.     When a customer requested to transfer crypto from Prime, Prime relied on the Internal Ledger to validate that the specific customer had previously transferred an amount of crypto to Prime sufficient to support the transfer request.  Prime then checked its multiple Omnibus Digital Wallets to determine which one(s) held sufficient crypto to satisfy the customer's transfer request.  Prime would then transfer crypto from an Omnibus Digital Wallet(s) with sufficient crypto to the customer.  Prime did not transfer crypto to the customer from the original Deposit Digital Address the customer had used to transfer crypto to Prime, or even necessarily from the original Omnibus Digital Wallet(s) where that customer's crypto had initially been swept.  In other words, the crypto Prime would send to a customer to satisfy an outgoing transfer request was not the same crypto that the customer had originally sent to Prime.

41.     Based on my review of Prime's company records, such as the Internal Ledger, and blockchain data, I have identified several illustrative examples of the crypto commingling that occurred at Prime.  The diagrams in this Declaration feature specific relevant examples to illustrate the concepts discussed in the Declaration and do not reflect the full scope of all of the blockchain activity in each diagram.  These examples are described below.

A.      **Prime Omnibus Digital Wallet ~b2ea (ETH Example)**

-10-

42.    One Omnibus Digital Wallet frequently used by Prime has the digital address ending in ~b2ea (the "~b2ea Wallet").

43.    Like Prime's other Omnibus Digital Wallets, the ~b2ea Wallet received crypto from Deposit Digital Addresses through the periodic sweeps that Prime conducted.

44.    The diagram[11] below (based on blockchain data) depicts three different Prime customers transferring crypto into different Deposit Digital Addresses at Prime, and Prime sweeping the crypto from the Deposit Digital Addresses into its omnibus ~b2ea Wallet:



45.    Thus, as demonstrated above, the ~b2ea Wallet (like all of Prime's Omnibus Digital Wallets) contained commingled crypto transferred to Prime by various customers.

46.    Another example of incoming transfers that the ~b2ea Wallet received were transfers from a different Prime digital wallet that Prime referred to as the "PT Segregated Assets" wallet ("PT Segregated Assets Wallet").

---

[11]    In the diagrams in the Brennan Decl., all digital wallets and Deposit Digital Addresses are referred to by the last four digits of their digital addresses.

47. The PT Segregated Assets Wallet was intended to keep Prime's corporate crypto separated from the crypto transferred to Prime by its customers, which would have been proper practice. However, in practice, this segregation did not actually occur. The PT Segregated Assets Wallet contained crypto transferred from a Prime Omnibus Digital Wallet, which itself contained crypto transferred to Prime by thousands of customers via Deposit Digital Addresses.

48. Despite its internal label "PT Segregated Assets", I observed that ETH was transferred from the PT Segregated Assets Wallet to the omnibus ~b2ea Wallet which contained commingled crypto transferred to Prime by various customers. For example, in March 2022, the PT Segregated Assets Wallet transferred 194 ETH to the ~b2ea Wallet.

49. The diagram below illustrates how crypto transferred to Prime by Customer A was subsequently commingled in the ~b2ea Wallet with crypto from the PT Segregated Assets Wallet. The same ~b2ea Wallet was then used to satisfy outgoing transfer requests of other Prime customers, including Customer B and Customer C. Therefore, in this example, the outgoing crypto transfers to Customer B and Customer C may have included some of the crypto transferred by Customer A along with crypto from other customers who had transferred crypto to the ~b2ea Wallet.



50. Similarly, the diagram below provides an example of how five different Prime Omnibus Digital Wallets transferred crypto amongst one another in a manner that appears entirely arbitrary and haphazard.



51.    In my experience, it is uncommon for such a high volume of transfers to occur amongst digital wallets controlled by a single entity.  I have been unable to ascertain a business purpose or rationale for the frequent transfers of crypto that Prime conducted between its different Omnibus Digital Wallets.

52.    The extensive commingling of crypto in Omnibus Digital Wallets at Prime makes it impossible to specifically attribute any crypto to a particular customer.

**B.    Prime Omnibus Digital Wallet ~73ck Illustration (BTC Example)**

53.    Another Omnibus Digital Wallet frequently used by Prime has the digital address ending in ~73ck (the "~73ck Wallet").

54.    This omnibus ~73ck Wallet was used for BTC transactions and held BTC transferred to Prime from numerous customers as well as BTC transferred into the ~73ck Wallet from other Prime Omnibus Digital Wallets, which in turn also held BTC transferred to Prime by multiple

customers and BTC transferred from other Prime Omnibus Digital Wallets.  This resulted in extensive

commingling of BTC within Prime's Omnibus Digital Wallets, as reflected in the diagram below.



55.     Similar to the ~b2ea Wallet example discussed herein for ETH, I have been unable to

ascertain a business purpose or rationale for the frequent transfers of BTC between Prime's different

Omnibus Digital Wallets.

**C.     Prime Omnibus Digital Wallet – ~df94 (USDT Example)**

56.     ETH is also used to pay gas fees associated with USDT transactions, which were other

types of crypto transactions that caused further commingling of crypto transferred to Prime by

customers.

57.     The diagram below illustrates a customer transaction involving USDT.  The customer

("Customer A") purchased USDT on a crypto exchange and then transferred USDT to a Deposit

Digital Address at Prime.  The USDT was then swept into one of Prime's Omnibus Digital Wallets with the digital address ending in ~df94 (the "~df94 Wallet") where it was immediately commingled with USDT that had been transferred to Prime by other customers.  Since USDT transactions occur on the Ethereum blockchain, ETH is needed to pay the gas fee to transfer the USDT from the Deposit Digital Address into the Omnibus Digital Wallet.  In this scenario, ETH from Prime's Omnibus Digital Wallet is used to cover the gas fees.  Since Customer A is only transacting in USDT, the ETH required for the transaction must be supplied from other ETH already held in the ~df94 Wallet.



58.     As a result, in this example, not only is the USDT that Customer A transferred to Prime commingled in the ~df94 Wallet, but also the ETH that was used to pay for the gas fees was commingled ETH, which further commingled the crypto at Prime.

59.     This example demonstrates how transactions involving USDT resulted in commingled USDT as well as further commingled ETH, making it practically impossible to differentiate between USDT transferred to Prime by one customer as compared to another Prime customer.

**D.     Prime Omnibus Digital Wallet ~b2ea (USDC Example)**

60.     Another type of cryptocurrency, USDC, required ETH for gas fees when transacted on the Ethereum blockchain resulting in further commingling of crypto at Prime.

61.     The diagram below shows two Prime Customers ("Customer A") and ("Customer B") transferring USDC from external digital wallets with digital addresses ending in ~4c79 and ~5023 to Deposit Digital Addresses ending in ~5c79 and ~154b, respectively.  The USDC was then swept into the ~b2ea Wallet where it was immediately commingled with USDC that had been transferred to Prime by other customers.  To cover the gas fees for transferring the USDC that Customer A transferred to Prime transfer to the ~b2ea Wallet, Prime transferred ETH to the Deposit Digital Address ending in ~5c79 from the ~b2ea Wallet.



62.     The ETH required for gas fees for Customer B's USDC transaction was transferred from a Deposit Digital Address ending in ~ed5a that was attributed to the Deposit Digital Address ending in ~154b that was also attributed to Customer B.  The Deposit Digital Address ending in ~ed5a had previously received ETH from the ~b2ea Wallet to pay for gas fees for the transfer of USDT to the ~b2ea Wallet the year before.  Prime then transferred the remaining ETH in the Deposit Digital Address ending in ~ed5a to the Deposit Digital Address ending in ~154b to be used for gas fees associated with Customer B's USDC transaction.  Finally, any remaining ETH in the Deposit Digital Address ending in ~154b was eventually transferred back to the ~b2ea Wallet.

63.     The above diagram demonstrates how USDC, USDT, and ETH were all commingled in the same Prime Omnibus Digital Wallet.

E.      **Prime's Crypto Transaction Fees**

64.     Based on my experience, Prime likely performed sweeps of each crypto type from the Deposit Digital Addresses into Omnibus Digital Wallets to pool crypto together to create certain efficiencies.

65.     Crypto transfers between different Prime's Vaults within Fireblocks occur on-chain, meaning that Prime would have to incur transaction fees when transferring crypto between Vaults at Fireblocks.

66.     To avoid transaction fees, Prime could simply adjust crypto entries on its Internal Ledger to avoid conducting any actual transactions on the blockchain, which would have otherwise incurred transaction fees.  By doing this, the crypto would technically remain in the same original Omnibus Digital Wallet, but the Internal Ledger would now attribute a new value to the customer.

67.     To reduce transaction fees that could not be avoided entirely through Internal Ledger entries, Prime could pool transactions and perform them during off-peak hours when the blockchain network was less congested and thus less expensive.  Thus, by pooling and commingling crypto into Omnibus Digital Wallets, Prime was able to reduce transaction fees.

              *i.     BTC Transaction Fees*

68.     When a customer requested a transfer of BTC from Prime, a fee would be incurred since the transaction would occur on-chain.  Prime minimized these fees by sweeping UTXOs (representing various remaining amounts of BTC) from other customer Deposit Digital Addresses into the same transaction.  Therefore, Prime satisfied a BTC transfer request by transferring crypto to a customer that had been transferred to Prime by other customers.

69.     The diagram below provides an example of a transaction in which BTC transferred from Prime Omnibus Digital Wallet with a digital address ending in ~vk39 (represented by the green

node below) (the "~vk39 Wallet"), as well as BTC transferred to Prime from six unique customers (each represented by different color nodes below) using multiple Deposit Digital Addresses, were swept together into a single transaction. In this example, Customer A (represented by the yellow node below) requested a transfer of 16.56 BTC. Prime swept UTXOs (representing various remaining amounts of BTC) from eleven Deposit Digital Addresses into the transaction, as reflected by the black diamond below which serves as a central point at which the UTXOs were aggregated and swept into the transaction. Customer A received 16.56 BTC as requested, and the remaining BTC left over from the transaction became a single UTXO which was sent back to a Prime Omnibus Digital Wallet. The combination of transactions reduced transaction fees for the next outgoing transfer request because twelve UTXOs (representing various amounts of BTC) from eleven Deposit Digital Addresses and one Prime Omnibus Digital Wallet were combined.



70.    In this single transaction depicted above and reflected in the chart below, although Prime swept BTC transferred from six different customers and the ~vk39 Wallet (totaling 12 UTXO

amounts), only two digital wallets received BTC in this transaction: Customer A received 16.56 BTC to an external digital wallet ending in ~p2wu and Prime received the remaining 0.699 BTC to the ~vk39 Wallet, which is now one UTXO.

| Transaction Parties | Amount of BTC Swept | UTXO Count | Amount of outgoing BTC transferred | Resulting UTXO Count |
|---|---|---|---|---|
| Customer A | 0.002 | 1 | 16.561 | 1 |
| Customer B | 0.0569 | 3 | 0 | 0 |
| Customer C | 0.0007 | 1 | 0 | 0 |
| Customer D | 2.9011 | 2 | 0 | 0 |
| Customer E | 0.1921 | 3 | 0 | 0 |
| Customer F | 5.5 | 1 | 0 | 0 |
| Prime Omnibus Digital Wallet ~vk39 | 8.6079 | 1 | 0.6997 | 1 |
| Total | 17.2607 | 12 | 17.2607 | 2 |

71.     As a result, the single UTXO remaining in the ~vk39 Wallet contained a combination of BTC transferred from six different customers in addition to BTC transferred from the ~vk39 Wallet.  Accordingly, for subsequent transactions involving the ~vk39 Wallet, it is practically impossible to distinguish which digital wallet the remaining 0.699 BTC originated from.

72.     This example demonstrates how in a single transaction, BTC that Customer A transferred to Prime was commingled in a single transaction.  Prime conducted over one million BTC transactions, and therefore, commingled BTC extensively, rendering it impossible to differentiate between the BTC that each customer transferred to Prime from other BTC at Prime.

### ii.     ETH Gas Fees (for ETH, USDT, and USDC Transactions)

73.     Similar to transfers of BTC between Prime's Vaults within Fireblocks, transfers of ETH, USDT, or USDC between Prime's Vaults within Fireblocks also occur on-chain.  Prime thus incurred gas fees when transferring ETH, USDT, or USDC between Vaults at Fireblocks.  Prime

incurred ETH gas fees when transferring USDT and USDC because ETH is needed to pay for gas fees to transfer USDT and USDC on the Ethereum blockchain.

74.     Gas fees can be reduced by pooling transactions and performing them during off-peak hours when the blockchain network is less congested.  Thus, by pooling crypto in Omnibus Digital Wallets in Prime's Vaults at Fireblocks, Prime was able to conduct grouped transactions for the purpose of incurring reduced gas fees.

75.     To help pay for these gas fees, Prime set up additional digital wallets which it referred to collectively as "gas stations" ("Gas Stations").  Prime funded the Gas Stations from its other digital wallets (including Prime Omnibus Digital Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions.

76.     Prime used a variety of sources to fund the Gas Stations, which resulted in Prime further commingling the crypto transferred to Prime by its various customers with Prime's own crypto.

77.     Within Prime's Fireblocks infrastructure, I have identified two Gas Stations (represented by the two bright green nodes in the below diagram):

(i)     Prime Gas Station ~6898

(ii)    Prime Gas Station ~575d

78.     These Gas Stations received ETH transferred from Prime's Omnibus Digital Wallets (represented by the green nodes at the top of the below diagram), customers' external digital wallets (represented by the pink, blue, red and yellow nodes in the below diagram), as well as several external digital wallets that do not appear to be attributable to Prime or its customers (represented by the gray nodes in the below diagram).

-21-



79.     I also have observed instances where Prime's operations personnel used fiat from one of Prime's commingled bank accounts to purchase ETH to refill the Gas Stations.

80.     For example, on April 26, 2022, a former Prime operations team employee submitted a request form for $4,290 "to purchase 1.5 ETH to refill the gas station" (the "April 26, 2022 Request Form"), as shown below.  The April 26, 2022 Request Form sought to transfer funds from one Santander bank account, with the account name "Prime Trust Operating Account," to a different Signature bank account, with an account name "T&C WIRE Clearing."  Based on my review of bank records, this Signature bank account held commingled fiat transferred to Prime by customers and, as demonstrated by this request, also held fiat used for Prime's operations.



81.     The April 26, 2022 Request Form asked if the transfer required a "ledger update".  The
Prime employee who completed the April 26, 2022 Request Form indicated "No", which indicates
that the internal transfer of fiat between operating and customer bank accounts would not be recorded
in Prime's Internal Ledger.

82.     The Gas Stations were funded by Prime's operational fiat, ETH from commingled
Omnibus Digital Wallets (including the ~b2ea Wallet described above), ETH transferred by
customers from external digital wallets, as well as ETH transferred by other external digital wallets.

83.     In several instances, the amount of ETH sent to Deposit Digital Addresses exceeded
the amount of ETH required to pay the gas fees.  In those scenarios, Prime would either leave the
excess ETH in the Deposit Digital Addresses to pay the gas fees for future crypto transfers or, in
some instances, would send the excess amount of ETH back to the Omnibus Digital Wallets.

84.     As a result, Prime's operational crypto was commingled with crypto transferred to Prime by customers.

## IV.     Prime's Fiat Commingling

85.     Prime held and commingled fiat that customers transferred to it in omnibus bank accounts along with fiat transferred to it by thousands of Prime's other customers and fiat Prime generated from its business operations.

86.     Because fiat that customers transferred to Prime was commingled with fiat from other customers and fiat Prime generated from its business operations, Prime was forced to rely on its Internal Ledger to keep track of transactions to identify how much Prime owed each of its customers.[12]  I was provided and reviewed Internal Ledger data.

87.     Prime also transferred funds between bank accounts that contained fiat transferred to Prime from customers and bank accounts that primarily contained fiat Prime generated from Prime's business activities.  These internal transfers further commingled fiat.

88.     According to the Internal Ledger, bank account statements, and bank reconciliation files I reviewed, Prime regularly made internal transfers between Prime's bank accounts.  Prime would move funds between its different bank accounts, regardless of the source of funds, on an as-needed basis to satisfy wire and Automated Clearing House ("ACH") requests.

89.     Prime had numerous bank accounts at different banks depending on the time period.  Based on my review of the bank statements, during a given period, certain bank accounts were primarily used depending on the type of transaction.  For example, Prime predominantly used one

---

[12]     Deposition of ███████ ███████ *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████ Dep."), 89: 19–25.

omnibus bank account at BMO ("BMO x3077"), for incoming and outgoing wire transfers during 2023.

90.    BMO x3077 contained commingled funds that had been transferred to it from Prime's other bank accounts as well as directly from Prime customers.

91.    A large volume of debits and credits occurred almost daily to and from BMO x3077. However, Prime's bank statements for BMO x3077 only include reference numbers regarding the movement of funds into or out of that account.  There are no other details within the bank statements. This makes it difficult to determine who was transferring funds into Prime and the recipients of outbound transfers.

92.    Prime also would regularly make internal transfers from BMO x3077 into a different omnibus bank account at BMO ("BMO x9934") to earn a higher rate of interest.  Most of the unused funds left in BMO x3077 at the end of each day would be transferred back to BMO x9934 as BMO x9934 provided a higher rate of interest than BMO x3077.  Transfers between the bank accounts were described in Prime's bank statements as "PC Transfers".

93.    It appears the vast majority of funds contained in BMO x9934 were commingled funds that had been transferred into BMO x9934 from the commingled BMO x3077 account.  BMO x9934 also contained some funds that had been transferred into it from other commingled bank accounts held by Prime, such as CRB and Signature bank accounts.

94.    These CRB and Signature bank accounts operated in a largely similar manner as BMO x3077—*i.e.*, they contained commingled funds that had been transferred from other Prime bank accounts containing funds transferred to Prime by other Prime customers.

95.    For instance, "CRB x9892" and "CRB x4453"" were omnibus bank accounts at CRB utilized by Prime.  These accounts were used primarily for internal transfers and payments via

-25-

automated clearing house ("ACH").  Thus, during 2023, it appears that Prime primarily utilized either BMO x3077, CRB x9892, or CRB x4453 depending on whether Prime needed to make transfers via wire or ACH.

96.     Due to the extensive commingling of funds within Prime's omnibus bank accounts, the funds held within these omnibus bank accounts cannot be attributed to specific customer deposits or withdrawals.

97.     Prime bank statements reflect the movement of funds between Prime bank accounts but do not include details sufficient to identify where those funds originally came from, whom they were being transferred to, or for what reason they were being transferred.

98.     Transfers between Prime accounts usually occurred in round dollars, as opposed to specific amounts based on specific transactions.  This suggests that Prime likely estimated the amount of funds to transfer instead of transferring specific funds in response to specific transaction activity. This practice further adds to the difficulty in connecting transfers with specific transactions reflected in Prime's Internal Ledger.

99.     Based on my experience, numerous internal transfers amongst bank accounts without accurate recordkeeping can be indicative of fraud.  It also can suggest that an entity is facing cash shortfalls and is moving funds around to manage funds in a manner to satisfy withdrawals or other immediate, pressing cash needs.

V.    **Prime's Inadequate Reconciliation Processes**

100.    According to Prime's records and sworn testimony from former employees, Prime did not perform regular or timely reconciliations of accounts and, at least before March 2021, any reconciliations that Prime conducted were manual.[13]

101.    Reconciliation processes are critical internal controls.  They enable companies to identify potential errors or fraud so that their books and records are accurate.  They also permit companies to validate the amount of cash that the company holds.  Reconciliation processes typically consist of comparing transactions or other financial activities between the company's internal records and the bank records to verify the data and the proper amounts of account balances.

102.    For Prime's fiat, reconciliation processes generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger during a given time period with the bank account activity during that same time period.

103.    ████ ████ ("██-██████ Prime's former SVP of Operations and Reconciliations, largely designed Prime's reconciliations processes.  ████ ████ explained:

> Q:    Okay.  And when you moved into your new role in March of 2021 as operations and reconciliations, what was the reconciliations piece?
>
> A:    Prime Trust did not have reconciliation tools, essentially.   So my responsibility was in kind of designing the reconciliation tools.
>
> Q:    What's a reconciliation tool?
>
> A:    Somebody makes a request for a transaction: How can you basically reconcile that it occurred.  If that makes sense.
>
> Q:    Can you—can you expand a little bit?  So a customer says, I want to buy Bitcoin?

---

[13]    *See* Deposition of ████ █  *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "████ Dep."), 19:23 - 20:13.

A:     Yeah.  So, well, it wouldn't be necessarily for the purchases, but, for instance, a client's account says that they have one Bitcoin in their account. Can you confirm that it was received on the Ledger.

Q:     Okay.  So you're confirming that you actually have the assets that your client's accounts are reflecting they have; is that right?

A:     In a way, yeah.  So it was assuming that if we had assets displayed, you know, do we actually have them.[14]

104.     ███████ ██████ ("███_███████ Prime's former Chief of Regulatory Affairs, described "reconciliations" as "taking the general ledger and reconciling it to a bank statement; taking customer, you know, account statements and reconciling those to the bank statement wherever those assets may be held.  When I say assets, I'm talking about Fiat."[15]

105.     Both ███ ██████ and ███ █████ testified as to the insufficiency of Prime's reconciliation processes during their tenures with Prime.

106.     ███ █████ testified: "Reconciliations were not being done in a timely manner."[16]

107.     ███ █████ discussed Prime's reconciliations process both before and after March 2021:

A:     There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated . . .

. . .

Q:     Okay.  So you weren't—you weren't responsible for fixing whatever happened prior, you were responsible for forward-looking projects for reconciliation; is that the idea?

A:     Yeah, I was—I was put in that position to essentially build the automated systems for transactions looking forward.  Once the system was, I guess you can say, built, you know, I was let go of the responsibilities of building

---

[14]    ███ Dep., 18:3–19:7.

[15]    ███ Dep., 16:4–9.

[16]    Id. at 38: 23–24.

-28-

it, and there were teams that were brought on to essentially do the reconciliation.[17]

108.    For crypto, Prime's reconciliation processes were in the beginning stages of being developed in early 2022 and generally consisted of comparing the amounts and transaction activity reflected on Prime's Internal Ledger and Prime's Fireblocks environment.

109.    I also reviewed internal Prime communications concerning commingling of fiat and crypto as well as asset reconciliation.

110.    For example, on December 17, 2022, ▇▇ ▇▇▇ ("▇▇ ▇ Prime's former General Counsel, sent an email to several Prime employees concerning a Nevada Financial Institutions Division ("Nevada FID") request for information regarding Prime's statement that it "invested in additional Ether[e]um using fiat currency from its omnibus accounts."[18]  Specifically, Nevada FID requested that Prime "[p]lease provide a list of clients impacted from the investment and which omnibus accounts were utilized."[19]

111.    On December 19, 2022, ▇▇ ▇▇ responded: "Bank account, as in where was the USD pulled to credit our ledger and eventually purchased the ETH on our ledger?  If so, I don't believe any specific bank accounts were used, *as management considered all funds tangible in our omnibus model*.  In their decision, no bank movements were needed/done before the credits were requested to the ledger."[20]

---

17    ▇▇ Dep., 19:25–20:5; 21:14–22:2.

18    ▇▇ Dep., Ex. 28 (internal quotations omitted).

19    *Id.*

20    *Id.*

112.    On December 28, 2022, ████ ████ former SVP and Head of Banking and Trust Operations, responded: "████ ████ and I met today.  We are in agreement that we are not able to specify what customer is out of the funds due to our omnibus structure."[21]

113.    Given the above testimony from former executives, it is clear that Prime did not perform regular or timely reconciliations, which demonstrates that Prime lacked critical internal controls.  Based on my experience, without such internal controls, companies cannot readily identify potential errors or fraud to verify and ensure that their data and records are accurate.  Therefore, Prime did not have adequate safeguards or processes in place to validate the amount of fiat and crypto that the company held and accurately attribute the proper balances to Prime customers.

## VI.    The 98f Wallet Caused Further Commingling of Fiat and Crypto

114.    The most notable example of Prime's commingling of both fiat and crypto and its failure to reconcile its Internal Ledger was when Prime used fiat transferred to it by its customers to make purchases of ETH to replace ETH that was locked in an inaccessible "multi-sig" digital wallet (the "98f Wallet").[22]

115.    In December 2021, one of Prime's customers, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC ("Abra"), requested a transfer from Prime of 5,867.71 ETH (worth approximately $24,000,000.00 at the time[23]).  At this time, Prime realized that Abra had been

---

[21]    *Id.*

[22]    A "multi-sig" digital wallet requires digital signatures of multiple individuals to access and transact with the crypto stored on the digital wallet.  The "98f Wallet" is referred to herein as such because it has a digital address ending in the characters "98f."

[23]    Price data was obtained from CoinGecko.com.  The monthly closing price for ETH (which was approximately $4,085) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

transferring ETH into a forwarder digital wallet[24], which automatically had been forwarding the ETH into the inaccessible 98f Wallet.

116.    By December 2021, Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000.00 at the time[25]) into the 98f Wallet.

117.    Prime decided to satisfy Abra's December 2021 (and subsequent) ETH transfer requests by using fiat transferred to Prime by other customers to purchase replacement ETH from one of Prime's liquidity providers ("Liquidity Provider").

118.    Regarding this decision to use commingled fiat to purchase replacement ETH from Liquidity Provider, █████ █████ ("█ █████ Prime's former Chief Operating Officer, testified as follows:

> Q:    So [Customer is] depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:    I would defer to █████ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:    What's use of omnibus funds?
>
> A:    As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.
>
> Q:    And which funds were used to make the purchases of the ETH to fund the transactions?

---

[24]   A "forwarder digital wallet" is a type of digital wallet that automatically sends crypto that the digital wallet receives to another digital wallet.  This is often used by businesses to enhance security and streamline operations.

[25]   Price data was obtained from CoinGecko.com.  The monthly closing price for ETH (which was approximately $4,085) was calculated by adding each day's closing price and dividing the daily closing price by the number of days in the month.

A:    Funds from the fiat account.  Fiat omnibus account.  Is my understanding.
Once again,███ would know specifically.[26]

119.    Abra continued to request ETH transfers, meanwhile the ETH in the 98f Wallet

remained inaccessible.  Between December 23, 2021 and March 30, 2022, Abra requested that Prime

transfer a total of 48,034.57 ETH (worth approximately $145,000,000.00 at the time[27]).  Prime

continued to use commingled fiat to purchase replacement ETH from Liquidity Provider.  During

that same period, Prime recorded ten different wires to Liquidity Provider's account, which

purportedly represented new fiat transferred into Liquidity Provider's account to cover the ETH

purchased from Liquidity Provider, as shown in the table below.

| Date | USD Internal Ledger "Wire" Transfer[28] Amount | ETH On-Chain Transfers |
|---|---|---|
| 12/23/2021 | $11,958,000 | 2,999.99 |
| 12/31/2021 | $12,158,250 | 3,250.00 |
| 1/6/2022 | $2,778,400 | 800.00 |
| 1/6/2022 | $7,293,300 | 2,100.00 |
| 1/22/2022 | $5,000,000 | 1,930.50 |
| 3/12/2022 | $4,644,000 | 1,800.00 |
| 3/15/2022 | $8,524,750 | 3,049.98 |
| 3/15/2022 | $8,043,000 | 3,000.00 |
| 3/29/2022 | $7,902,800 | 2,300.00 |
| 3/30/2022 | $8,065,048 | 2,347.22 |

---

[26]    Deposition of ███  ███  *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the
"███  Dep."), 92:25–93:18.

[27]    Price data was obtained from CoinGecko.com between the dates of December 23, 2021 and March 30, 2022.  The
price for ETH (which was approximately $3,031) was calculated by adding each day's closing price and dividing the
daily closing price by the number of days in the time period..

[28]    Prime did not actually execute any of these wire transfers.  *See* ███ Dep., 164:22–165:10.

120.    As Prime did not actually receive any new funds, Prime used the commingled fiat that had been transferred to it by its customers to fund these replacement ETH purchases from Liquidity Provider.

121.    The below diagram illustrates ten of the replacement ETH purchases that Prime made from Liquidity Provider, which it ultimately used to satisfy the withdrawal requests of Abra.



122.    Because the ETH that Abra had originally transferred to Prime was (and still is to this day) locked away in the inaccessible 98f Wallet, it is indisputable that the ETH that Prime transferred to Abra to satisfy its withdrawal requests could not be the same ETH that Abra had originally transferred to Prime.  The ETH that Abra received was purchased by Prime using commingled fiat that had been transferred to Prime by other customers.  Moreover, prior to Prime transferring ETH to Abra, the ETH was commingled with other ETH (transferred to Prime by Abra, Liquidity Provider, and other Prime customers) in the ~b2ea Wallet discussed above.  In short, (i) commingled fiat was used to purchase ETH, (ii) this ETH was then commingled with ETH that other customers had transferred to Prime, and (iii) commingled ETH was then transferred to Abra.

-33-

123.    Certain executives at Prime seem to have undertaken steps to corrupt Prime's internal records in connection with the replacement ETH purchases to make it appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for Liquidity Provider.

124.    Specifically, Prime settled the ETH purchases from Liquidity Provider by "credit[ing]" the Liquidity Provider's customer account at Prime with fiat amounts equivalent to each ETH purchase.

125.    To "credit" Liquidity Provider's fiat customer balance with Prime, Prime had to input a "contribution" on Prime's Internal Ledger to make it appear as if Liquidity Provider had wired fiat to Prime. However, Liquidity Provider did not actually wire fiat to Prime in connection with the ETH purchases.

126.    ████  ████  testified on this subject as follows:

A:    So let me—let me make sure I understand what you said.  You said how to get money to [Customer].  You meant how to get money to [Liquidity Provider]; right?

A:    Sorry, yeah, that's what I meant.  [Liquidity Provider].

Q:    Okay.  So in order to credit [Liquidity Provider's] cash account at Prime, there needed to be a contribution on the internal Ledger; is that right?

A:    Correct.

Q:    And once there is a contribution to the internal Ledger, then when [Liquidity Provider] goes to its account, it looks like there is more cash in the account; isn't that right?

A:    Correct.

Q:    There's not actually any more cash in the bank account; right?

A:    No, there is no—there is no credit of that money to the bank accounts, only to the Ledger.[29]

---

[29]    ████ Dep., 155:11–156:9.

127.    This method of settlement of the ETH purchases from Liquidity Provider resulted in a discrepancy between the amount of fiat that Prime's Internal Ledger reflected and the actual amount of fiat that Prime held in its bank accounts:

> Q:    [T]here's going to be cash reflected in [Liquidity Provider's] account, but that cash is not actually in the bank; is that right?
>
> A:    Correct.  Correct.
>
> Q:    And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?
>
> A:    Correct . . .
>
> Q:    I see.  But the Ledger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?
>
> A:    Exactly.
>
> Q:    That's ultimately what happened; right?
>
> A:    Yeah, that's exactly what happened.[30]

128.    The illustrative chart below[31] demonstrates that Prime's Internal Ledger falsely indicated that there were "incoming" wire transfers to Liquidity Provider between December 23, 2021 and March 30, 2022:

---

[30]    *Id.* at 144:11–20; 146:7–15.

[31]    This illustrative chart is not an image directly copied from Prime's Internal Ledger. Rather, this chart contains data related to certain transactions that was pulled from Prime's Internal Ledger.

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

129.    Prime's bank account statements do not reflect any of the above wire transfers ever occurring.

130.    For example, the above data reflects that Prime received the following incoming wire transfers: (i) $11,958,000.00 on December 23, 2021; and (ii) $12,158,250.00 on December 31, 2021. These transfers correspond with the first two replacement ETH purchases from Liquidity Provider. However, these wires are not reflected in Prime's relevant bank account statements.[32]

131.    ███ ███ confirmed that these purported incoming wire transfers would not be identifiable in any Prime bank account statements:

Q:    When it says funds transfer in column F and it says "wire, wire, wire." Do you see that?

A:    Yes.

Q:    There were no wire transfers; right?

A:    Yes.

Q:    Just to be clear. Yes, there were not any wire transfers in connection with these [Liquidity Provider] purchases; right?

---

[32]    *See* Prime's December 23, 2021, and December 31, 2021, bank account statements from Signature Bank attached as **Exhibits 2 and 3**, respectively.

-36-

A:      Yes, there were no wire transfers . . .

Q:      And we can take you through—we've looked at it, but it wouldn't surprise you that there were no wire transfers reflected in the bank account statements for Prime Trust concerning these transactions; right?

A:      Correct.

Q:      And that's because there were no wire transfers out to [Liquidity Provider] in connection with these transactions; right?

A:      No wire transfers in.[33]

132.   As discussed herein, certain executives at Prime seem to have undertaken steps to corrupt Prime's internal record keeping.  The false entries to Prime's Internal Ledger further add to the difficulty in connecting transfers with specific transactions reflected on Prime's Internal Ledger.

## VII.   Defendant Cannot Identify Specific Fiat It Provided to Prime

133.   To analyze the fiat transactions between Prime and Defendant, I reviewed Prime's Internal Ledger, API log audit data, bank statements, and bank reconciliation data.

134.   Attached as **Exhibit 4** is a list of transfers by Prime to Defendant between May 16, 2023 and August 14, 2023.[34]

135.   During the Preference Period, Prime transferred to Defendant, by or on behalf of Pagotec Consultancy LTD (the "Integrator"), the transfers identified in Exhibit 4.  For each Defendant listed in Exhibit 4, I identified Defendant's transactions recorded in Prime's Internal Ledger by searching for internal account names associated with Defendant and Integrator on the Internal Ledger

---

[33]    ▮▮▮ Dep., 164:22–165:10; 166:5–15.

[34]    Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

and confirmed Defendant's transactions in the bank data.  These internal account names did not correspond with actual unique, segregated bank accounts.

136.    The transfers of fiat during the Preference Period, as listed in Exhibit 4, from Prime Trust LLC to Defendant, by or on behalf of Integrator were transferred from omnibus bank account BMO x3077.

137.    For each Defendant listed in Exhibit 4, I performed a subsequent new value analysis. I confirmed that during the Preference Period, Prime transferred to Defendant, by or on behalf of Integrator, fiat identified in Exhibit 4, net of any potential subsequent new value.  For the Preference Period, I analyzed the bank and API log audit data for each fiat transfer.

* * *

138.    In sum, Prime's Internal Ledger, Prime's bank account data, blockchain data, Prime's repeated transfers of fiat between commingled omnibus bank accounts, Prime's repeated transfers of crypto between commingled Omnibus Digital Wallets in the Vaults at Fireblocks, Prime's use of fiat from the omnibus bank accounts to purchase ETH because Prime lost access to the 98f Wallet, Prime's falsified Internal Ledger wire transfer entries covering Prime's replacement ETH purchases, and Prime's gross failures in fiat segregation, crypto segregation, reconciliation processes, and inability to distinguish fiat and crypto transferred to Prime by certain customers from fiat and crypto transferred to Prime by other customers and fiat generated from Prime's business operations, make it clear that neither PCT, Defendant, nor anyone else, can:  (i) identify the specific fiat that Defendant transferred to Prime; or (ii) identify which specific fiat in Prime's commingled bank accounts were used for fiat transfers from Prime to Defendant during the Preference Period.

Dated: August 14, 2025
        Jupiter, Florida

/s/ *James P. Brennan*
James P. Brennan
Senior Managing Director
J.S. Held, LLC

# Exhibit 1

# JP Brennan
Senior Managing Director, Global Investigations, Cryptocurrency



## Key Expertise



- Forensic Accounting
- Anti-money Laundering ("AML")
- Compliance
- Investigations
- Damages
- Financial Crime
- Fraud
- Asset Tracing (Crypto + Traditional)
- Money Services Business ("MSBs")
- Operational Due Diligence
- Cryptocurrency Security Standard ("CCSS")
- KYC / Onboarding
- Managed / Outsourced Services

## Education

Master of Science (MS), St. John's University, 2002

Bachelor of Science (BS), St. John's University, 2001

## Project Geographical Experience

U.S., UK, Singapore, Bermuda, Canada, Bahamas, Gibraltar, Cyprus, Switzerland

## Languages

English

## Summary of Experience

JP Brennan is the Global Head of Fintech, Payments, Crypto Compliance and Investigations at J.S. Held. He brings over 20 years of experience in forensic accounting, damage calculation, auditing, litigation consulting, anti-money laundering ("AML") compliance, cryptocurrency regulatory compliance, OFAC/sanctions review, complex enhanced and operational due diligence, and bankruptcy. He has an in-depth understanding of the complexities that many FinTech's are faced with concerning their regulatory framework as well as those issues from a financial crime compliance perspective.

Mr. Brennan has substantial experience in providing complex forensic accounting and financial fraud investigative services, cryptocurrency asset / wallet tracing, development and implementation of AML programs, outsourced Chief Compliance Officer services, as well as providing managed services for large scale remediation and compliance projects. His clients include major law firms, cryptocurrency exchanges (centralized / decentralized), digital asset issuers, custodians, multinational banks, funds, payment processors, financial institutions, and investors.

His expert experience includes such high-profile matters such as Bernard L. Madoff Investment Securities (investigation), Lehman Brothers (bankruptcy investigation), Caesars Entertainment Operating Corp. (examiner report), Bank of New York-Mellon (compliance monitorship), Quadriga CX (crypto asset tracing), and LUNA Foundation Guard (crypto asset tracing).

## Speaking Engagements

Mr. Brennan has presented in various forums as well as moderated multiple cryptocurrency related panels that included topics such as investigations, risk and regulatory, asset recovery, crypto in bankruptcy as well as complex forensic tracing.

## Professional Affiliations/Memberships/Licenses/Training

Association of Certified Fraud Examiners

Certified Bitcoin Professional

## Role at J.S. Held

JP is involved with matters in consulting as well testifying expert capacity. These matters include fiat and digital asset forensic and tracing investigations, recovery of assets, the development, implementation and assessment of regulatory programs, monitorships, training for law enforcement agencies, government licensing, investigations on behalf of examiners, receivers, forensic accounting, and trustees.

## Contact

48 Wall Street, New York, NY 100436 | +1 212-952-5000 (O) | +1 917-244-8931 (M) | jp.brennan@jsheld.com

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



---

## Work Experience

J.S. Held, LLC, Senior Managing Director, 2022 – Present

Kroll, LLC (f/k/a Duff & Phelps), Associate Managing Director, 2017 – 2022

Alvarez & Marsal Holdings, LLC, Director, 2012 – 2017

FTI Consulting, Inc., Director, 2004 – 2012

Deloitte & Touche LLP, Audit Staff, 2002 – 2004

## Select Litigation and Project Experience

### Cryptocurrency and Blockchain Related:

- Retained as the cryptocurrency expert in the Chapter 11 Bankruptcy Proceedings for Prime Trust due to insolvency. Provides litigation consulting and expert witness services, related to the investigation of the company as well as performance of other analysis including but not limited fraudulent conveyances and preference payments.

- Retained by a U.S. cryptocurrency exchange as an expert to defend against customer allegations involving the exchanges breach of fiduciary duty and lack of an appropriate AML program.

- Retained in the Voyager Digital Bankruptcy to investigate and recover fraudulent ACH customer payments.

- Retained by a Web3 company that provides infrastructure and applications to be built using its platform. Perform expert and litigation services to defend against allegations of market manipulations, inappropriate disclosure for sources and uses of funds, unjust enrichment, and breach of fiduciary duty.

- Luna Foundation Guard / Terraform Labs / Do Kwon – retained to produce an audit report and cryptocurrency tracing of the assets used to defend the peg of the UST algorithmic stablecoin. Additional work related to market manipulation, wash trading, improper public disclosures, and manipulation of transactions on the Terra network.

- Retained by the Brazilian gov't to conduct the cryptocurrency asset tracing and recovery in the INDEAL pyramid scheme.

- Retained as the expert in a cryptocurrency employment dispute related to the payment of assets at genesis and calculation the associated staking rewards and airdrops on the Cosmos Network.

- Retained as the expert by the Cred Inc. Liquidation Trust to trace and investigate the theft and fraudulent transfer of assets by Company executives.

- Retained by Bo Shen in the recovery of over $40 million stolen from his personal wallet.

- QuadrigaCX – retained by the receiver (E&Y) to conduct the tracing of cryptocurrency assets.

- Retained as the financial adviser in the EminiFX bankruptcy and investigation.

- Retained by the Canadian courts in the Index Finance hack as the custodian for the cryptocurrency assets stolen.

- Retained as the expert in a well-known international gambling site dispute.

- Retained in the USA v. Ian Freeman (formerly Ian Bernard) and Aria DiMezzo (formerly James Baker) to assist with various litigation support services.

- Conducted and performed operational due diligence for financial and crypto related platforms including but not limited to: trade execution, custody, and third-party providers.

- Often retained by bitcoin atm operators, crypto lenders, crypto funds, crypto exchanges, payment processors, and funds to conduct independent AML reviews.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.



**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



- Developed and implemented tracing and monitoring processes and technologies for a crypto money servicer business ("MSBs").
- Retained by the receiver in a Canadian cryptocurrency exchange investigation and recovery of assets.
- Retained by a large Seychelles-based cryptocurrency exchange to provide a report on proper OTC related procedures.
- Successfully performed an investigation into the fraudulent theft of cryptocurrency related assets of a crypto lender.
- Member of an international FATF committee working on the Travel Rule for Virtual Asset Providers ("VASPs").
- Performed the outsourcing of cryptocurrency asset reviews for a major US Cryptocurrency Exchange.
- Provide Managed Services for enhanced due diligence procedures for a major US Cryptocurrency Exchange.
- Retained by a U.S. Cryptocurrency Exchange to address regulatory concerns regarding their geo-fencing of IP addresses.
- Retained by a U.S. crypto lender in connection with their 2017 initial coin offering ("ICO") to provide recission payments to investors.
- Conducted cryptocurrency security standard ("CCSS") implementations and assessments.
- Conduct annual FBI Training – "How to Conduct Cryptocurrency Investigations."

**Non-Cryptocurrency and Blockchain Related:**

- Provided investigative services and litigation support to the court-appointed trustee for the liquidation of Bernard L. Madoff Investment Securities and his counsel. Engagement assistance to date has included the day-to-day direction and supervision of teams in areas including forensic investigation, data analysis and litigation consulting.
- Retained by the US Federal Reserve Bank to review AML Programs for their 12 branches.
- Served on the team selected by the U.S. Attorney offices in the Eastern and Southern Districts of New York and Western Pennsylvania to support the monitoring of the non-prosecution agreements of both The Bank of New York and Mellon Financial Corporation, to monitor and report on the state of the banks' suspicious activity reporting practices and AML procedures.
- Served on the monitorship team for the Standard Chartered Bank.
- Provided litigation consulting and expert witness services, including expert report preparation and deposition and trial preparation for a multi-billion-dollar accounting malpractice case filed in a class action against one of the major accounting firms. The case involved review and analysis of several years of audit work papers as well as research and analysis.
- Provided litigation consulting, including expert report preparation and deposition and trial preparation for an oil and gas company to determine whether a series of corporate transactions constituted a fraudulent conveyance and as a result rendered the company insolvent.
- Created onboarding policies and procedures for banks, hedge funds, as well as crypto funds and exchanges.
- Served on the investigations team, retained by Caesars Entertainment Operating Company, Inc. ("CEOC"), Richard J. Davis, to investigate and determine whether fifteen transactions between CEOC and the leveraged buyout sponsors ("LBO") arose to constituted constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty.
- Expert support work on the determination of payments to creditors in the Nortel Networks bankruptcy.
- Expert support work on the calculation of damages / lost profits for a pharmaceutical dispute.
- Expert support in the investigation into various matters within the Lehman bankruptcy.
- Expert support in the investigation of Allen Stanford.
- Provided and oversaw a team of 350+ compliance professionals to help meet a New York State Department of Financial Services remediation for a large US-based cryptocurrency exchange.
- Hired as the outsourced CCO multiple payment processors that are going through the money transmission licensing process.

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.

**JP Brennan**
Senior Managing Director, Global Investigations, Cryptocurrency



## Speaking Engagements and Articles

- Law360 article, Using Data To Arm Against Future Crypto Market Turbulence", December 16, 2022.

- Luna Foundation Guard release, "Today, LFG releases the technical audit report conducted by JS Held, an experienced third-party auditing firm, providing full transparency into the trading, blockchain records, and efforts of LFG and TFL to defend the price of TerraUSD ($UST) between May 8th & May 12th, 2022", November 16, 2022.

- Brave NewCoin article, "The Cryptocurrency Regulatory Framework: How Countries are Approaching the Virtual Currency", March 2022.

- Wolters Kluwer Banking and Financial Services Policy Report – April 30, 2019, "The Curios Case of Crypto."

- Kroll article, "Cryptocurrencies: Protecting Your Downside in the Face of Uncertainty", May 2018.

- Medium Article Contributor: https://medium.com/@james.p.brennan1.

- Official Monetary and Financial Institutions Forum ("OMFIF") Digital Monetary Institute Symposium 2021, "Cryptocurrency's Regulatory Impact", September 2021.

- MIT: Center for Real Estate," Real Disruption - How Technology is Changing and Challenging Real Estate", 2017.

- Kroll, "Examining the Anti-Money Laundering (AML) Risks and Red Flags of Crypto Exchanges", October 2021.

- BPP Continuing Education, "What you need to know when your clients are considering crypto", 2021.

- Association of Certified Fraud Examiners, "The Future of AML and Blockchain", May 2021.

- JS Held Thought Leadership Related Articles.

## Testimony

- *Michael Sofaer v. BKCM, LLC, Supreme Court of the State of New York, Country of New York.*

- *Paul Merkley v. Gemini Trust Company, LLC*, JAMS Arbitration.

# Exhibit 2

*Signature*
SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126          0

| Date | Description | | |
|------|-------------|--|--|
| | OBI:  MAGUIEXPRESS SA AR QCCUSEGFZ26,MAGUIEXPRESS S A | | |
| | OBI: | | |
| | OBI: | | |
| Dec 22 | INCOMING WIRE | | 236,562.50 |
| | REF#  20211222B6B7261F00311312221031FT01 | | |
| | FROM: MARXSMITH LLC                    ABA:   026009593 | | |
| | BANK: | | |
| | OBI:   GOODS REFERENCE CODE: QNCUSQTAN4Y | | |
| | OBI: | | |
| | OBI: | | |
| Dec 22 | INCOMING WIRE | | 250,000.00 |
| | REF#  20211222B6B7261F00174112220801FT01 | | |
| | FROM: ██████████        ABA:   021000021 | | |
| | BANK: | | |
| | OBI:   QCCUSGEFG | | |
| | OBI: | | |
| | OBI: | | |
| Dec 22 | INCOMING WIRE | | 250,000.00 |
| | REF#  20211222B6B7261F00307712221027FT01 | | |
| | FROM: PAXFUL USA INC             ABA:   026013356 | | |
| | BANK: | | |
| | OBI:   QCCUSK934, PAXFUL, INC 420003911352 | | |
| | OBI: | | |
| | OBI: | | |
| Dec 22 | INCOMING WIRE | | 300,000.00 |
| | REF#  20211222B6B7261F00576012221506FT01 | | |
| | FROM: ICHIOKA VENTURES LLC        ABA:   121000248 | | |
| | BANK: | | |
| | OBI:   FUNDS FOR REFERENCE QCCUSGMMK | | |
| | OBI: | | |
| | OBI: | | |
| Dec 22 | ONLINE TRANSFER CREDIT | | 60,000,000.00 |
| | ONLINE XFR FROM: XXXXXX6223 | | |
| Dec 23 | INCOMING WIRE | | 26.00 |
| | REF#  20211223B6B7261F00620912231555FT01 | | |
| | FROM: CP CONSTRUCTION VENTURES LLC  ABA:   324377613 | | |
| | BANK: | | |
| | OBI:   QNCUS9QXJKZ | | |
| | OBI: | | |

**SIGNATURE BANK**

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: 1███6126          0

| Date | Description | |
|---|---|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200.00 |
| | REF#  20211223B6B7261F00269412231010FT01 | |
| | FROM: ███████████  ABA:  31209536 | |
| | BANK: CITIBANK NA | |
| | OBI:  QNCUSV42DNZ | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 400.00 |
| | REF#  20211223B6B7261F00562312231459FT01 | |
| | FROM: ASIAM RESOURCES LLC  ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSXZMYKW | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800.00 |
| | REF#  20211223B6B7261F00416212231232FT01 | |
| | FROM: SYNAPSE FINANCIAL TECHNOLOGIES  ABA:  084106768 | |
| | BANK: | |
| | OBI:  SIGNATURE BANK NEW YORK, NY, US 61C476A938BC7F2CA4985F | |
| | OBI:  B0/QCCUSYZX4, PINE GROVE CONSULTING, INC. 420056235618 | |
| | OBI:  ; @FREELANCEVZLA; SERVICES | |
| Dec 23 | INCOMING WIRE | 2,000.00 |
| | REF#  20211223B6B7261F00186112230813FT01 | |
| | FROM: 1/FBO ████████  ABA:  NFSCUS3B | |
| | BANK: NATIONAL FINANCIAL SERVICES LLC | |
| Dec 23 | INCOMING WIRE | 2,675.00 |
| | REF#  20211223B6B7261F00419812231235FT01 | |
| | FROM: ███████  ABA:  021000021 | |
| | BANK: | |
| | OBI:  CUSCQNZ6H | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 4,545.00 |
| | REF#  20211223B6B7261F00399012231212FT01 | |
| | FROM: HERMANN, LLC  ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSAZ7H - THE COIN TRADING CO LLC420034051586 | |
| | OBI: | |

*Signature*  | SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   142 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|------|-------------|--|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,000.00 |
| | REF#  20211223B6B7261F00529812231428FT01 | |
| | FROM: ███████████        ABA:  321178158 | |
| | BANK: TULARE COUNTY FCU | |
| | OBI:  QCCUSAZ7HTHE COIN TRADING COMPANY, LLC420034051586 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 5,500.00 |
| | REF#  20211223B6B7261F00608112231544FT01 | |
| | FROM: ██████████        ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSFAVQME    COINMETRO | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 6,000.00 |
| | REF#  20211223B6B7261F00213512230900FT01 | |
| | FROM: LA GUACAMAYA LLC        ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 7,955.00 |
| | REF#  20211223B6B7261F00580912231515FT01 | |
| | FROM: BANK OF AMERICA        ABA:  026013576 | |
| | BANK: SIGNATURE BANK | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF#  20211223B6B7261F00029512230255FT01 | |
| | FROM: ██████████        ABA:  31209536 | |
| | BANK: CITIBANK NA | |
| | OBI:  QCCUSZ9EKRN, FINANLEADS S A | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 8,500.00 |
| | REF#  20211223B6B7261F00503712231401FT01 | |
| | FROM: █████████        ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |

Signature  SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page  143 of  426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                    8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ████6126        0

| Date | Description | |
|---|---|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 9,500.00 |
| | REF#  20211223B6B7261F00613612231549FT01 | |
| | FROM: ████████          ABA:  121000248 | |
| | BANK: | |
| | OBI:  QCCUSZ9EKRN FINANLEADS SA | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,000.00 |
| | REF#  20211223B6B7261F00378112231153FT01 | |
| | FROM: ████████████          ABA:  021000021 | |
| | BANK: | |
| | OBI:  QNCUSZRQ6C3 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 10,500.00 |
| | REF#  20211223B6B7261F00549512231446FT01 | |
| | FROM: COMMODORE MANAGEMENT LLC     ABA:  102000021 | |
| | BANK: | |
| | OBI:  INVESTMENT ON SECURITIESQCCUSAZ7H, THE COIN TRADING CO | |
| | OBI:  MPANYLLC 420034051586 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 14,700.00 |
| | REF#  20211223B6B7261F00303312231045FT01 | |
| | FROM: ████████          ABA:  026009593 | |
| | BANK: | |
| | OBI:  SERVICES | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 19,782.95 |
| | REF#  20211223B6B7261F00275312231013FT01 | |
| | FROM: INTERNATIONAL TRADING COMMERCE   ABA:  021201383 | |
| | BANK: VALLEYNATIONALBANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y MUNDUZ INTERNATIONAL | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,400.00 |
| | REF#  20211223B6B7261F00412412231228FT01 | |
| | FROM: TECC CONSULTING LLC | |
| | ABA:  121000248 | |

# Signature
## SIGNATURE BANK

Statement Period
From December  01, 2021
To    December  31, 2021
Page   144 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|---|---|---|
| | BANK: | |
| | OBI:  QCCUSZTF2-LOGISTIC FAST | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 23,500.00 |
| | REF#  20211223B6B7261F00060312230603FT01 | |
| | FROM: ████████████          ABA:  026009593 | |
| | BANK: | |
| | OBI:  QNCUSHRDX | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,000.00 |
| | REF#  20211223B6B7261F00062512230608FT01 | |
| | FROM: ███████████          ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSH6VPFC | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,000.00 |
| | REF#  20211223B6B7261F00328112230113FT01 | |
| | FROM: ████████████          ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSH6VPFC | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 25,080.00 |
| | REF#  20211223B6B7261F00156812230801FT01 | |
| | FROM: UR CHOICE DISTRUBUTOR INC.        ABA:  021000021 | |
| | BANK: | |
| | OBI:   REFERENCE # QCCUS3D46 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF#  20211223B6B7261F00244412230937FT01 | |
| | FROM: PND ADMINISTRATION SERVICES LLC    ABA:  021000021 | |
| | BANK: | |
| | OBI:   QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |

**SIGNATURE BANK**

Statement Period
From December  01, 2021
To    December  31, 2021
Page   145 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|------|-------------|--|
| Dec 23 | INCOMING WIRE | 33,000.00 |
| | REF#  20211223B6B7261F00520312231416FT01 | |
| | FROM: INOVASUPERSTAR LLC               ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 45,561.25 |
| | REF#  20211223B6B7261F00699512231734FT01 | |
| | FROM: PRIZEOUT CORP                    ABA:  026009593 | |
| | BANK: | |
| | OBI:  REFERENCE ID QXCUS2KFAXD | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 46,883.81 |
| | REF#  20211223B6B7261F00395912231208FT01 | |
| | FROM: VIRTUAL ASSETS LLC               ABA:  071902399 | |
| | BANK: | |
| | OBI:  TRADE SETTLEMENT               QCCUSWHQFN7, STILLM | |
| | OBI:  AN DIGITAL LLC 420048617770 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 60,000.00 |
| | REF#  20211223B6B7261F00465612231322FT01 | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE    ABA:  061110654 | |
| | BANK: THE COMMERCIAL BANK | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 64,000.00 |
| | REF#  20211223B6B7261F00150112230801FT01 | |
| | FROM: WAAVE TECHNOLOGIES INC.          ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUS7VT4 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 83,836.50 |
| | REF#  20211223B6B7261F00280112231022FT01 | |
| | FROM: DIGITAL ASSET MANAGEMENT LIMIT   ABA:  026013576 | |
| | BANK: | |

*Signature*
SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   146 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126        0

| Date | Description | |
|---|---|---|
| | OBI:  XACE LIMITED QCCUSQK4E | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 139,054.69 |
| | REF#  20211223B6B7261F00598012231532FT01 | |
| | FROM: PRIME TRUST, LLC AS AGENT FOR     ABA:   044000024 | |
| | BANK: | |
| | OBI:  PAYMENT | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 196,000.00 |
| | REF#  20211223B6B7261F00202212230840FT01 | |
| | FROM: MUNDUZ INTERNATIONAL INCORPORATED   ABA:   021000021 | |
| | BANK: | |
| | OBI:   REFERENCE CODE: QCCUS9 XF74Y -MUNDUZ INCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 200,000.00 |
| | REF#  20211223B6B7261F00535712231433FT01 | |
| | FROM: EMBLAZE ONE INC.                 ABA:   021000021 | |
| | BANK: | |
| | OBI:   REFERENCE NO. QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 212,500.00 |
| | REF#  20211223B6B7261F00686512231707FT01 | |
| | FROM: WESUPPLY SOLUTIONS, LLC          ABA:   043000096 | |
| | BANK: PNC BANK, N.A. | |
| | OBI:   QCCUS4JTVEP, ALTERPAY INTERNATIONALSOLUTIONS, LLC 4200 | |
| | OBI:   77366054 | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 233,471.25 |
| | REF#  20211223B6B7261F00039812230442FT01 | |
| | FROM: NORTH AMERICAN CAPACITY INSURANCE   ABA:   026009593 | |
| | BANK: | |
| | OBI:   40802346 0011793370-08-1-2021 Q/CCUSRV6P, PROGLOBIX LL | |
| | OBI:   C 4200843321.67, INV-0571   MOLECULAR /INV-0571/.02021 | |
| | OBI:   1468290/MOLECULAR PATHOLOGY | |
| Dec 23 | INCOMING WIRE | 236,562.50 |
| | INCOMING WIRE | |

*Signature*   **SIGNATURE BANK**

Statement Period
From December  01, 2021
To    December  31, 2021
Page    147 of    426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126          0

| Date | Description | |
|---|---|---|
| | REF#  20211223B6B7261F00284812231027FT01 | |
| | FROM: MARXSMITH LLC            ABA:  026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 250,000.00 |
| | REF#  20211223B6B7261F00157312230801FT01 | |
| | FROM: ██████████       ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 334,000.00 |
| | REF#  20211223B6B7261F00574112231508FT01 | |
| | FROM: YUMMY INC             ABA:  211075086 | |
| | BANK: | |
| | OBI:  QCCUSYZX4, PINE GROVE CONSULTING,INC. | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 357,000.00 |
| | REF#  20211223B6B7261F00484612231338FT01 | |
| | BANK: M&T BANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y, MUNDUZINCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 500,000.00 |
| | REF#  20211223B6B7261F00305612231049FT01 | |
| | FROM: DISTRIBUTED COMPUTING SYSTEMS      ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 800,000.00 |
| | REF#  20211223B6B7261F000800012230719FT01 | |
| | FROM: CB INTERNATIONAL BANK LLC      ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUS3E2T, CB INTERNATIONAL BANK LLC 420030048263 | |
| | OBI: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ███████6126        0

| Date | Description | |
|---|---|---|
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,000,000.00 |
| | REF#  20211223B6B7261F00386012231158FT01 | |
| | FROM: DCG INTERNATIONAL INVESTMENTS LTD  ABA:  322286803 | |
| | BANK: | |
| | OBI:  REFERENCE: QCCUS3HRZQV, INFINITY VENTURES C1, L.P. 420 | |
| | OBI:  098750470 DCG INTERNATIONAL INVESTMENTS LTD. INVESTMEN | |
| | OBI:  T | |
| Dec 23 | INCOMING WIRE | 1,199,500.00 |
| | REF#  20211223B6B7261F00633012231607FT01 | |
| | FROM: LEGEND TRADING INC       ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSXWTC, BIRDIE CORPORATION 420069656697 | |
| | OBI: | |
| | OBI: | |
| Dec 23 | INCOMING WIRE | 1,298,000.00 |
| | REF#  20211223B6B7261F00633112231607FT01 | |
| | FROM: LEGEND TRADING INC       ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSXWTC, BIRDIE CORPORATION 420069656697 | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1.00 |
| | REF#  20211224B6B7261F00284912241307FT01 | |
| | FROM: CP CONSTRUCTION VENTURES LLC    ABA:  324377613 | |
| | BANK: | |
| | OBI:  QNCUS9QXJKZ | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF#  20211224B6B7261F00134112240801FT01 | |
| | FROM: ██████████      ABA:  021000021 | |
| | BANK: | |
| | OBI:  USD WIRE | |
| | OBI: | |
| | OBI: | |
| Dec 24 | INCOMING WIRE | 1,000.00 |
| | REF#  20211224B6B7261F00134312240801FT01 | |
| | FROM: ██████████      ABA:  021000021 | |

# Exhibit 3

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                      8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|---|---|---|
| | BANK: M&T BANK | |
| | OBI:  REFERENCE CODE QCCUS9XF74Y, MUNDUZINCORPORATED | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 236,562.50 |
| | REF#  20211230B6B7261F00369212301046FT01 | |
| | FROM: MARXSMITH LLC           ABA:  026009593 | |
| | BANK: | |
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 312,000.00 |
| | REF#  20211230B6B7261F00644012301445FT01 | |
| | FROM: YUMMY INC             ABA:  211075086 | |
| | BANK: | |
| | OBI:  QCCUSYZX4 PINE GROVE CONSULTING INC | |
| | OBI: | |
| | OBI: | |
| Dec 30 | INCOMING WIRE | 350,000.00 |
| | REF#  20211230B6B7261F00572312301350FT01 | |
| | FROM: PROGLOBIX LLC          ABA:  071000288 | |
| | BANK: | |
| | OBI:  QCCUSRV6P, PROGLOBIX LLC420084332167 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 1,918.00 |
| | REF#  20211231B6B7261F00225212310851FT01 | |
| | FROM: ECN OTC, LLC           ABA:  021000021 | |
| | BANK: | |
| | OBI:  QCCUSEH4VMF | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 2,105.00 |
| | REF#  20211231B6B7261F00405212311237FT01 | |
| | FROM: PRIME TRUST LLC        ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 2,500.00 |
| | REF#  20211231B6B7261F00462712311401FT01 | |
| | FROM: ███████ OR ███████     ABA:  021000021 | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ███████6126          0

| Date | Description | |
|------|-------------|--|
| | BANK: | |
| | OBI: QNCUSVPCE42 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 4,618.97 |
| | REF# 20211231B6B7261F00531512311618FT01 | |
| | FROM: ██████████         ABA:  121000248 | |
| | BANK: | |
| | OBI:  QNCUSX3VPN9 KXUW9MAJCMPS | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 5,400.00 |
| | REF# 20211231B6B7261F00389512311214FT01 | |
| | FROM: COMMODORE MANAGEMENT LLC         ABA:  102000021 | |
| | BANK: | |
| | OBI:  REFERENCE: QCCUSAZ7HTHE COIN TRADING COMPANY, LLC42003 | |
| | OBI:  4051586 | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 10,000.00 |
| | REF# 20211231B6B7261F00503012311506FT01 | |
| | FROM: ██████████         ABA:  121105156 | |
| | BANK: | |
| | OBI:  QCCUSAZ7H, THE COIN TRADING COMPANY420034051586 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 15,000.00 |
| | REF# 20211231B6B7261F00336412311113FT01 | |
| | FROM: ██████████         ABA:  124003116 | |
| | BANK: | |
| | OBI:  QCCUSGEFG | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 17,780.00 |
| | REF# 20211231B6B7261F00350612311129FT01 | |
| | FROM: ██████████         ABA:  062005690 | |
| | BANK: | |
| | OBI:  REFERENCEQCCUSJRVZ UNITED COIN INC420030696060 | |
| | OBI: | |
| | OBI: | |

*Signature* | SIGNATURE BANK

Statement Period
From December 01, 2021
To   December 31, 2021
Page   174 of   426

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022

PRIME TRUST LLC                         8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information

Primary Account: ██████6126         0

| Date | Description | |
|------|-------------|--|
| Dec 31 | INCOMING WIRE | 20,802.00 |
| | REF#  20211231B6B7261F00332812311108FT01 | |
| | FROM:                        ABA:  021000089 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 25,000.00 |
| | REF#  20211231B6B7261F005215123115 52FT01 | |
| | FROM: ████████        ABA:  121000248 | |
| | BANK: | |
| | OBI:   REFERENCE QCCUSZTF2 WESTCLIFFTECH | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 26,000.00 |
| | REF#  20211231B6B7261F005261123116 03FT01 | |
| | FROM: INOVASUPERSTAR LLC        ABA:  021000021 | |
| | BANK: | |
| | OBI:   QCCUSYZX4, PINE GROVE CONSULTING,INC. 420056235618 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 28,500.00 |
| | REF#  20211231B6B7261F005443123116 55FT01 | |
| | FROM: ████████ DBA BUTLER HOME MAINT ABA:  114000093 | |
| | BANK: | |
| | OBI:   QNCUSJDYNRP | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 32,100.00 |
| | REF#  20211231B6B7261F005458123117 00FT01 | |
| | FROM: TECC CONSULTING LLC        ABA:  121000248 | |
| | BANK: | |
| | OBI:   QCCUSZTF2-LOGISTIC FAST | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 35,630.00 |
| | REF#  20211231B6B7261F002259123108 54FT01 | |
| | FROM: ████████        ABA:  043318092 | |
| | BANK: | |
| | OBI:   GEM PURCHASEREFERENCE CODE: QNCUSJ7GYQR | |
| | OBI: | |
| | OBI: | |

*Signature*  SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                        8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ████6126          0

| Date | Description | |
|------|-------------|--|
| Dec 31 | INCOMING WIRE | 70,000.00 |
| | REF#  20211231B6B7261F00437012311318FT01 | |
| | FROM: COIN TIME LLC              ABA:  121000248 | |
| | BANK: | |
| | OBI:  REF QCCUSWHQFN7, STILLMAN DIGITAL LLC 420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 121,100.00 |
| | REF#  20211231B6B7261F00544812311655FT01 | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT  ABA:  322070381 | |
| | BANK: | |
| | OBI:  REV YOUR PD REF 3158304019 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 130,000.00 |
| | REF#  20211231B6B7261F00324512311058FT01 | |
| | FROM: ASPEN LAKE LLC/DBA COIN GENIE  ABA:  061110654 | |
| | BANK: THE COMMERCIAL BANK | |
| | OBI:  QCCUSWHQFN7, STILLMAN DIGITAL LLC420048617770 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 150,000.00 |
| | REF#  20211231B6B7261F00544912311656FT01 | |
| | FROM: EASTWEST BK-WIRE CLEARING DEPT  ABA:  322070381 | |
| | BANK: | |
| | OBI:  REV YOUR PD REF 2273120497 | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 172,620.30 |
| | REF#  20211231B6B7261F00317612311048FT01 | |
| | FROM: INTERNATIONAL TRADING COMMERCE MAR  ABA:  066015084 | |
| | BANK: APOLLO BANK | |
| | OBI:  REFERENCE CODENQCCUS9XF74Y MUNDUZINTERNATIONAL | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 236,562.50 |
| | REF#  20211231B6B7261F00258712310938FT01 | |
| | FROM: MARXSMITH LLC              ABA:  026009593 | |
| | BANK: | |

*Signature* | SIGNATURE BANK

PRIVATE CLIENT GROUP 159
485 MADISON AVENUE
NEW YORK, NY 10022


PRIME TRUST LLC                          8-159
BAM CLEARING
330 S RAMPART BLVD SUITE 260
LAS VEGAS NV  89145

See Back for Important Information


Primary Account: ███████6126        0

| Date | Description | |
|---|---|---|
| | OBI:  GOODS REFERENCE CODE: QNCUSQTAN4Y | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 300,000.00 |
| | REF#  20211231B6B7261F00271812310952FT01 | |
| | FROM: 1/████████████  ABA:  NFSCUS3B | |
| | BANK: NATIONAL FINANCIAL SERVICES LLC | |
| Dec 31 | INCOMING WIRE | 600,000.00 |
| | REF#  20211231B6B7261F00434912311317FT01 | |
| | FROM: EMBLAZE ONE INC.           ABA:  021000021 | |
| | BANK: | |
| | OBI:  REFERENCE NO. QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,000,000.00 |
| | REF#  20211231B6B7261F00348512311127FT01 | |
| | FROM: COMPASS MINING INC        ABA:  026013576 | |
| | BANK: | |
| | OBI:  QCCUSGMMK | |
| | OBI: | |
| | OBI: | |
| Dec 31 | INCOMING WIRE | 3,450,000.00 |
| | REF#  20211231B6B7261F00099312310800FT01 | |
| | FROM: PRIME TRUST LLC           ABA:  021000021 | |
| | BANK: | |
| Dec 31 | INCOMING WIRE | 6,500,000.00 |
| | REF#  20211231B6B7261F00096112310751FT01 | |
| | FROM: YUCHEN SUN                ABA:  026013576 | |
| | BANK: | |
| | OBI:  CREDIT TO: PRIME TRUST, LLC REFERENCE: QCCUSW47D, POLO | |
| | OBI:    DIGITAL ASSETS, INC. ██████3280 PURPOSE: FUNDING | |
| | OBI: | |

Withdrawals and Other Debits

| Dec 01 | OUTGOING WIRE | 5.00 |
|---|---|---|
| | REF#  20211201B6B7261F005566 | |
| | TO:   1/███████████  ABA:  021000021 | |
| | BANK: JPMORGAN CHASE BANK, NA      ACCT# GB40REVO009970 | |
| | OBI:  20211124B6B7261F00196511240801FT03 | |

# Exhibit 4

| Defendant | Date of Outgoing Transfer | Outgoing Transfer Amount (USD or Unit Count) | Currency Type | Incoming Transfer Amount (USD or Unit Count) | Total Outgoing Amount | Total Net of Subsequent New Value | Currency Type |
|---|---|---|---|---|---|---|---|
| Avilac Inc. | 5/31/2023 | (62,095.20) | USD | | | | |
| Avilac Inc. | 6/7/2023 | (27,718.50) | USD | | | | |
| Avilac Inc. | 6/12/2023 | (18,470.03) | USD | | | | |
| Avilac Inc. | 6/20/2023 | (60,862.35) | USD | | (169,146.08) | (169,146.08) | USD |
| Eagle Communication Trade Co. Ltd. | 6/1/2023 | (150,000.00) | USD | | | | |
| Eagle Communication Trade Co. Ltd. | 6/5/2023 | (80,085.00) | USD | | | | |
| Eagle Communication Trade Co. Ltd. | 6/13/2023 | (200,000.00) | USD | | (430,085.00) | (430,085.00) | USD |
| Games to Go, LLC | 5/18/2023 | (405,860.00) | USD | | | | |
| Games to Go, LLC | 5/26/2023 | (486,000.00) | USD | | | | |
| Games to Go, LLC | 6/2/2023 | (323,843.50) | USD | | | | |
| Games to Go, LLC | 6/12/2023 | (460,000.00) | USD | | | | |
| Games to Go, LLC | 6/15/2023 | (319,346.62) | USD | | (1,995,050.12) | (1,995,050.12) | USD |
| HongKong Bishop Technoogy Co. Lim. | 5/24/2023 | (305,768.80) | USD | | (305,768.80) | (305,768.80) | USD |
| Ignite International Ltd. | 5/23/2023 | (500,000.00) | USD | | (500,000.00) | (500,000.00) | USD |
| InTech Electronic Co. Limited | 5/17/2023 | (300,046.00) | USD | | (300,046.00) | (300,046.00) | USD |
| M&M Global Enterprises LLC | 5/22/2023 | (471,823.80) | USD | | | | |
| M&M Global Enterprises LLC | 6/1/2023 | (364,012.50) | USD | | | | |
| M&M Global Enterprises LLC | 6/8/2023 | (471,953.80) | USD | | | | |
| M&M Global Enterprises LLC | 6/15/2023 | (324,275.00) | USD | | (1,632,065.10) | (1,632,065.10) | USD |
| Ritech Smart Technology Limited | 6/6/2023 | (320,038.65) | USD | | (320,038.65) | (320,038.65) | USD |
| Yellow Spot Communications Limited | 5/17/2023 | (50,000.00) | USD | | | | |
| Yellow Spot Communications Limited | 6/7/2023 | (150,000.00) | USD | | | | |
| Yellow Spot Communications Limited | 6/14/2023 | (200,000.00) | USD | | (400,000.00) | (400,000.00) | USD |
| Yue Xin Electric Technology Limited | 5/17/2023 | (100,000.00) | USD | | (100,000.00) | (100,000.00) | USD |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Prime Core Technologies Inc., *et al.*,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br>(Jointly Administered) |
| PCT Litigation Trust,<br>Plaintiff,<br>vs.<br><br>Avilac Inc., Eagle Communication Trade Co. Ltd., Games to Go, LLC, HongKong Bishop Technoogy Co. Lim., Ignite International Ltd., InTech Electronic Co. Limited, M&M Global Enterprises LLC, Ritech Smart Technology Limited, Yellow Spot Communications Limite,<br><br>Defendants. | Adv. No. **Refer to Summons** |

## NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As party to litigation you have a right to adjudication of your matter by a judge of this Court. Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge. Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case. Alternative Dispute Resolution (ADR) is offered through a program established by this Court. The use of these services are often productive and effective in settling disputes. The purpose of this Notice is to furnish general information about ADR.

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration. In each, the process is presided over by an impartial third party, called the "neutral."

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you. It fosters an environment where offers can be discussed and exchanged. In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement. The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential. You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator. At that point, the process is the

---

1   The Debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

same as arbitration.  You, through your counsel, will present evidence to a neutral, who issues a decision.  If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding. If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

Dated:         August 14, 2025                              */s/ Stephen L. Grant, Sr.*
                                                             *Clerk of Court*